FILED

APR 1 1 2007

RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF CALIFORNIA

WILLIE EDWARDS,

    Petitioner,

    vs.

BEN CURRY, Warden,

    Respondent.

    On Habeas Corpus.

_____/

BOARD OF PAROLE HEARINGS,
ARNOLD SCHWARZENEGGER, Governor,

    Real Parties In Interest

_____/

Case No.

CV 08 1923

[Los Angeles County Sup. Ct. Case No.
BH004240; Second Dist. Ct. of Appeal, Div. 2,
Case No. B204060; Cal. Sup. Ct Case
No. S159343.

CW

---

### MEMORANDUM OF POINTS & AUTHORITIES IN SUPPORT OF
### PETITION FOR WRIT OF HABEAS CORPUS

---

TRACI S. MASON, Esq.
State Bar # 237663
THE LAW OFFICES OF TRACI S. MASON
45 East Julian Street
San Jose, CA 95112
(408) 286-2808

Attorneys for Petitioner,
WILLIE EDWARDS

TABLE OF CONTENTS...........................................................................i

TABLE OF AUTHORITIES....................................................................iv

MEMORANDUM OF POINTS & AUTHORITIES...............................................1

INTRODUCTION...............................................................................1

STATEMENT OF FACTS......................................................................3

   A.  The Circumstances of the Offense .............................................................3

   B.  Social History...........................................................................3

      (1)     Personal Background.................................................................3

      (2)     Juvenile and Adult Convictions.....................................................4

   C.  Advances During Incarceration.....................................................4

      **(1)**     Vocational History....................................................................6

      **(2)**     Educational History...................................................................6

      **(3)**     Self Help & Therapy Program.........................................................6

      (4)     Parole Plans..........................................................................7

      (5)     Disciplinary Record...................................................................8

   D.  Parole Consideration History.....................................................8.

      1.  Initial Parole Consideration Hearing, March 15, 1999...............................9

      2.  First Subsequent (Second Overall) Parole Consideration Hearing, April 15, 2003...........................................................................................9

      3. Second Subsequent (Third Overall) Parole Consideration Hearing, September 29, 2005...........................................................................................10

THE LOS ANGELES COUNTY SUPERIOR COURT'S DENIAL............................11

SUMMARY OF GROUNDS FOR RELIEF...................................................12

LEGAL ARGUMENT........................................................................15

   I.     HABEAS CORPUS IS THE PROPER REMEDY BY WHICH TO TEST THE PROPRIETY OF A PAROLE DENIAL BY THE BOARD....................................................................................15

   A.     PETITIONER HAS A FEDERALLY PROTECTED LIBERTY INTEREST IN PAROLE.................................................17

   II.    THE STATE COURT'S DETERMINATION WAS BOTH UNREASONABLE AND WRONG...................................18

III.   CONTINUED RELIANCE ON THE COMMITMENT OFFENSE VIOLATES DUE PROCESS; THE IMMUTABLE FACTS OF THE CRIME NO LONGER HAVE PREDICTIVE VALUE AS TO PETITIONER'S CURRENT THREAT TO SOCIETY...............19

A. THE FOCUS IS ON CURRENT DANGEROUSNESS.....19

B. THE COMMITMENT OFFENSE IS A FACTOR THAT IS <u>INTIALLY</u> PERMITTED BY STAUTE AND THE REGULATIONS TO MEASURE WHETHER PETITIONER PRESENTS A CURRENT THREAT TO THE COMMUNITY; AFTER A PERIOD OF TIME, IT LOOSES ALL PREDICTIVE VALUE....................................................24

C. AFTER NINETEEN YEARS OF INCARCERATION AND POSITIVE PROGRAMMING, THE COMMITMENT OFFENSE NO LONGER HAS PREDICTIVE VALUE AS TO MR. EDWARDS' CURRENT DANGEROUSNESS.......................25

Summary...................................................35

IV.   NO EVIDENCE EXISTS TO SUPPORT DENIAL UNDER §3401..........................................................................36

1.   The Manner in Which Mr. Edwards Committed His Offense Does Not Demonstrate An Exceptional Disregard For Human Suffering or Exceptional Callousness or Cruelty or That It Was Calculated..........................................

2.   Mr. Edwards was offered a plea for Manslaughter; Thus, the Board and District Attorney are Precluded From Pronouncing the Commitment Offense as Demonstrating a Callous Disregard for Human Life, Exceptionally Cruel or Calculated.........................................................39

3.   Mr. Edwards' Motive Was Not Trivial...................39

V.   ASIDE FROM THE COMMITMENT OFFENSE, THE OTHER REASONS CITED BY THE BOARD FOR DENYING PETITIONER'S PAROLE FOR A THIRD TIME ARE NOT INDICATIVE OF UNSUITABILITY...............................41

1

1. Petitioner's Purported Lack of Insight Into His Criminality......42

2. Self-Help and Therapy..................................................43

3. Petitioner's Juvenile Record..........................................44

VI.    THE BOARD VIOLATED PETITIONER'S DUE PROCESS RIGHTS WHEN IT REFUSED TO RECONSIDER HIS PAROLE SUITABILITY FOR ANOTHER FOUR YEARS, WITHOUT ANY SUBSTATIATED REASON..................................46

VII.   THE STATE COURT'S RULING IS CONTRARY TO CLEARLY ESTABLISHED SUPREME COURT LAW AS IT RELIES ON LANGUAGE THAT IS UNCONSTITIONALLY VAGUE. ......48

CONCLUSION..............................................................................55

iii

FEDERAL CASES

Biggs v. Terhune, 334 F.3d 910, 915-16 (9th Cir. 2003) ............................................. 20, 21, 30, 32
Board of Pardons v. Allen, 482 U.S. 369 (1987) ................................................................... 20
Brewster v. Bd. of Educ. of Lynwood Unified Sch. Dist., 149 F.3d 982 ...................................... 19
Brown v. Kane, ___ F.Supp.2nd ___ [2007 WL 1288448] (2007) ........................................ 23, 32
Eddings v. Oklahoma 455 U.S. 104 (1982) ........................................................................... 37
Ellis v. District of Columbia, 84 F.3d 1413 ........................................................................... 20
Godfrey v. State of Georgia 446 U.S. 420 (1980) ........................................................... 55, 56, 57
Greenholtz v. Nebraska Penal Inmates, 442 U.S. 1 (1979) ......................................... 15, 19, 20
Gurley v Rhoden, 421 U.S. 200 (1975) ................................................................................. 18
Hayward v. Marshall 512 F.3d 536 (9th Cir. 2008) ......................................................... passim
Irons v. Carey [Irons II], 476 F.3d 658, 665 (9th Cir. 2007) ..................................... 20, 31, 38
Jancsek v. Or. Bd. of Parole, 833 F.2d 1389 (9th Cir.1987) ...................................................... 15
LaJoie v. Thompson, 217 F.3d 663 ....................................................................................... 19
Lockyer v. Andrade, 538 U.S. 63 (2003) ............................................................................... 18
Maynard v. Cartwright 486 U.S. 356 (1988) ......................................................................... 56
McQuillion v. Duncan, 306 F.3d 896, 900 (2003) ......................................... 19, 20, 21, 28
Michael v. Ghee, 498 F.3d 372 ............................................................................................. 20
Mullaney v. Wilbur, 421 U.S. 684 (1975) ............................................................................. 18
Martin v. Marshall, 431 F.Supp.2d 1038 (N.D. Cal. 2006) ............................................... passim
Blankenship v. Kane, ____F.Supp.___[2007 WL 1113798] (N.D.Cal.2007) ................. 23, 32, 34
Peltier v. Wright, 15 F.3d 860, 862 ..................................................................................... 18
Roper v. Simmons 543 U.S. 551 (2005) ........................................................................... 36, 37
Sanchez v. Kane, 444 F.Supp.2d 1049 (C.D. Cal. 2006) .................................................. passim
Schwartzmiller v. Gardner, 752 F.2d 1341(9th Cir. 1984) ......................................................... 52
Shell v. Mississippi 498 U.S. 1(1990) .................................................................................... 56
Sprinkle v. Carey, Slip Copy [2008 WL 564995] (E.D. 2008) ....................................... 20, 23
Stanford v. Kentucky  492 U.S. 361 (1989) ..................................................................... 36, 37
Taylor v. Maddox, 366 F.3d 992 (9th Cir. 2004) .............................................................. 18, 21
Thomas v. Brown, 513 F.Supp.2d 1124, (N.D. Cal. 2006) ........................................................ 23
Thompson v. Oklahoma 487 U.S. 815(1988) ......................................................................... 37
United States v. Doremus 888 F.2d 630 (9th Cir. 1989) ........................................................... 52
Williams v. Rhoades, 354 F.3d 1101 .................................................................................... 19
Williams v. Taylor, 529 U.S. 362 (2000) ............................................................................... 18
Wisconsin v. Mitchell, 113 S.Ct. 2194 (1993) ...................................................................... 18
Wolff v. McDonnell, 418 US 539 (1974) ............................................................................... 17
Ylst v. Nunnemaker, 501 U.S. 797 (1991) ............................................................................. 19

STATE CASES

In re Dannenberg,  34 Cal. 4th 1061 (2005)
In re Dannenberg [Dannenberg II]  156 Cal.App.4th 1387 (2007)
In re Ernest Smith, 114 Cal. App. 4th 343 (2003) ............................................................. passim
In re Gray, 151 Cal.App.4th 379 (2007)
In re Jackson, 39 Cal. 3d 464 (1985) ................................................................................ 14, 49
In re Lee 143 Cal.App.4th 1400 (2006) ............................................................ 22, 23, 33, 35
In re Mark Smith, 109 Cal.App.4th  489 (2003) ............................................................. passim

In re Morrall, 102 Cal.App.4th 280 (2002)......................................................... 50
In re Ramirez, 94 Cal.App.4th 549 (2001) ............................................. 15, 38, 39
In re Rosenkrantz  29 Cal.4th 616, 654 (2002)........................................... passim
In re Scott  [Scott II] 133 Cal.App.4th 573 (2005) .................................... passim
In re Van Houten 116 Cal.App.4th 339 (2004) ............................................ 40, 41
In re Weider, 45 Cal.App.4th 570, 589 (2006) ............................. 22, 23,25,29
People v. Belmontes 34 Cal. 3d 335 (1983) ...................................................... 49
In re Barker 151  Cal.App.4th, 346 (2007) ............................................ 22, 32, 36
In re Elkins 144 Cal.App.4th 475, at 499 (2006)............................. 22, 32, 35, 52
In re Scott  119 Cal.App.4th 871 ............................................................ 40, 41, 42
Superior Court of Santa Clara County v. Engert 31 Cal.3d 797 (1982) ................ 56, 57

FEDERAL STATUTES

28 U.S.C. § 2254(a) ............................................................................................ 17
28 U.S.C. § 2254(d) ............................................................................................ 18
28 U.S.C. § 2254(d)(1) ....................................................................................... 15
28 U.S.C. § 2254(d)(2) ........................................................................ 18, 21, 22
28 U.S.C. §2254........................................................................................... 38
28 U.S.C. §2254(d)(2) .................................................................................... 21
U.S. CONST. Amends. V ................................................................................... 19

STATE STATUTES

Penal Code § 3041 ........................................... 15,16,20,26,27,29,39, 42, 43
Penal Code §187 ................................................................................................. 40
Penal Code §3041(a) .................................................................................... 27, 53
Penal Code §3041.5 ............................................................................................ 50
Penal Code §5011 ............................................................................................... 44
Pen. Code, §3000 ............................................................................................... 39

FEDERAL RULES

CALJIC 8.11 ....................................................................................................... 52

STATE REGULATIONS

Cal. Code Regs. tit. 15 § 2402 ........................................................................... 27
Cal. Code Regs. tit. 15 § 2402(a)........................................................................ 27
Cal. Code Regs. tit. 15 § 2402(c)........................................................................ 44
Cal. Code Regs. tit. 15 § 2402(c)(1) ................................................................... 27
Cal. Code Regs. tit. 15 §2403 ............................................................................ 50

TRACI S. MASON, Esq.
State Bar # 237663
THE LAW OFFICES OF TRACI S. MASON
45 East Julian Street
San Jose, CA 95112
(408) 286-2808

Attorneys for Petitioner,
WILLIE EDWARDS

### IN THE UNITED STATES DISTRICT COURT
### FOR THE NORTHERN DISTRICT OF CALIFORNIA

WILLIE EDWARDS,

           Petitioner,

           -vs-

BEN CURRY, Warden,

           Respondent.

           On Habeas Corpus.
_____/

ARNOLD SCHWARZENEGGER,
Governor, BOARD OF PAROLE
HEARINGS,

           Real Parties in Interest

_____/

[Los Angeles County Sup. Ct. Case No. BH004240; Second Dist. Ct. of Appeal, Div. 2, Case No. B204060; Cal. Sup. Ct Case No. S159343]

***MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PETITION FOR WRIT OF HABEAS CORPUS***

### INTRODUCTION

    This case presents as simple of an issue as can be imagined in litigation of this type. Now that the Ninth Circuit has firmly spoken regarding the rules applicable to multiple denials of parole in the case of *Hayward v. Marshall* 512 F.3d 536 (9th Cir. 2008), two (2) points are perfectly clear, which together control the resolution of this matter. First, in evaluating whether a state court has unreasonably applied clearly established Supreme Court authority, the courts are now directed to focus solely on whether, in light of the passage of time, the naturally declining

1

1    probative value of static facts, and the strength of the evidence of rehabilitation, the crime
2    continues to satisfy the "some evidence" standard by rationally establishing that the inmate
3    currently remains dangerous. *Id.* at 541-544. Secondly, in making this determination, the court is
4    to be guided by the California statutes and regulations, as the California courts have interpreted
     that they are to apply, determining whether in light of those rules, the evidence supports the
5    regulatory factors relied on by the Board, and furthermore, whether the factor so established
6    shows the inmate to remain currently dangerous. *Id.*

7        Here, based merely on the fact that this is a case involving three (3) total denials of
8    parole, over nineteen (19) years of incarceration on a case with a seventeen-to-life term, and
9    overwhelming and uncontradicted evidence of complete rehabilitation, the application of the
     *Hayward* rules would obviously lead to only one inescapable conclusion. However, despite the
10   fact that absolutely no evidence exists to support the conclusion that Mr. Edwards is
11   unreasonably dangerous within the meaning of *California Code of Regulations*, title 15
12   [hereinafter "*Cal. Code Regs.*, tit. 15"] §2281(a), the governing regulation providing the standard
13   upon which parole is granted or denied, he has once more been denied parole.  Instead of
14   establishing a nexus between Mr. Edwards' current dangerousness and the Board's decision to
15   denial parole, the Board merely recited a legally inadequate decision, one that was not supported
16   by a finding of current dangerousness, and denied Mr. Edwards for a ***completely unwarranted***
     ***four (4) years.***
17
18       In the instant case, Mr. Edwards committed a crime for which the legal system imposed a
     *very specific punishment*.  Mr. Edwards was to serve seventeen-to-life with the possibility of
19   parole, assuming he programmed well.  The goal of that sentence, under the indeterminate
20   sentencing law in existence at that time, was to achieve rehabilitation.  It is undisputed that Mr.
21   Edwards has attained that goal.  Nonetheless, on September 29, 2005, the Board again found Mr.
22   Edwards unsuitable for parole at his ***third*** suitability hearing "finding" that he "would pose an
     unreasonable risk of danger to society or a threat to public safety if released from prison." Exh.
23   A at 68. The Board's decision was without any adequate legal justification in light of Mr.
24   Edwards' irrefutable rehabilitation through vocational, educational, and spiritual growth, his
25   violence free behavior throughout his entire incarceration, full psychological clearance, and solid
26   parole plans.  As will be seen, Mr. Edwards is unlawfully confined, and the Board's continuous
27   denials have resulted in a violation of Petitioner's due process rights.

28

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## *STATEMENT OF FACTS*

### A. *The Circumstances of the Offense*

Mr. Edwards was convicted of second-degree accomplice murder with use of a firearm arising from a series of events that occurred between two rival gangs, Petitioner being a member of neither. Exh. A, pp. 100-102. As a young man of nineteen (19) years old, Mr. Edwards accompanied two friends to an area where two groups of gang members were congregating. *Id.* Mr. Edwards was aware of the group's reputation for violence and brought a gun for protection. One group was comprised of younger men and the other of men in the twenties. Mr. Edwards was familiar with some of the younger men from his regular basketball games. *Id.* Several of the older men approached Mr. Edwards and asked him to communicate a message, a request for the cessation of the arguments between the groups, to the younger men. Mr. Edwards did so, and received a favorable reply from the younger group. *Id.* As he and some younger men walked towards the older group to talk, a popping noise was heard. Mr. Edwards did not know who fired the first shot. *Id.* After the shot was fired, everyone started shooting. Mr. Edwards was carrying a nine-millimeter hand gun and fired it, without aiming at anyone. Exh. A, pp. 72, 112. When the fire ceased, a Mr. Hicks had been killed. The friends Mr. Edwards had accompanied were in possession of an AK-47 rifle and a hand gun. Exh. E, p. 313. Mr. Hicks' wounds were determined consistent with shots fired from an AK-47. Mr. Edwards did *not* shoot the victim; however, he was convicted of second degree murder on a theory of accomplice liability. Exh. A, p. 81. The District Attorney offered Mr. Edwards a deal of manslaughter in exchange for his testimony against his co-defendant; however, Mr. Edwards refused for fear of retaliation against his family. He explained this choice at the September 29, 2005 Board Hearing stating: "I was thinking about my family because I had younger sisters and brother. I didn't want to affect them and their lifestyle in school or whatever because of the neighborhood *[sic]* grew up in." Exh. A, p. 55.

### B. *Social History*

#### (1)    **Personal Background**

Mr. Edward was born on May 1, 1969 to Linda Edwards and Willie Edwards, a bus driver and security guard, respectively. Exh. B, p. 105. Mr. Edwards' parents separated when he was eleven (11) years of age; however, they divorced amiably and his family remained close.

His mother remarried but Petitioner spent his school vacations with his biological father. *Id.* He has six siblings. Exh. B, p. 87. His siblings, except for an older sister who was convicted for a drug related crime, are all law abiding. He had a good relationship with all of his siblings. *Id.* at 105. Mr. Edwards' younger sister was killed by her jealous boyfriend. *Id.* at 104. Prior to his incarceration, Mr. Edwards completed the 11th grade but went on to earn a GED in prison. Exh. C, p. 240. He has no history of special education classes or learning disabilities. *Id.* He has no indication of mental or emotional health problems. *Id.* Prior to entering the CDCR, Mr. Edwards had, on occasion, experimented/used socially alcohol and marijuana. Exh. B, p. 91. Mr. Edwards' sexual orientation has always been heterosexual and he made friends and girlfriends easily, prior to incarceration. He has never been married but has a son and is on good terms with his son's mother. Exh. B, p. 105.

Due to a surgery to correct torn tendons in his left knee, Mr. Edwards uses an orthopedic leg brace and requires the assistance of a cane. *Id* at 99, 106. In addition, he needs to be housed in a lower bunk and a lower tier so that he can move around. He can walk up and down stairs as long as he is wearing his knee brace. *Id.* at 119.

### (2)    Juvenile and Adult Convictions

Mr. Edwards was adjudicated of a misdemeanor for being a minor in possession of a weapon on August 22, 1985, and was ordered home on probation. Exh. B, p. 90. In July of 1986, he was arrested for possession of marijuana and carrying a concealed weapon in a vehicle for which he was ordered to camp/community placement and adjudicated of a felony and misdemeanor, respectively. Exh. B, p. 90. However, he has no incidents of violence either as a juvenile or adult. As case law has made clear, regulatory factors indicating unsuitability, refer to *violent* priors, thus, reliance on Mr. Edward's almost twenty two (22) year old adjudications are without merit. *In re Mark Smith,*[1] 109 Cal.App.4[th]  489, 504-505 (2003).

As an adult, Petitioner's only conviction is for the commitment offense.

### C. *Advances During Incarceration*

Recognition of Mr. Edwards' positive programming during his incarceration is well documented throughout his Central File. Just some of CDCR staff's many positive observations about his work ethic and attitude are demonstrated in the following comments:

"On Thanksgiving Day…Inmate Edwards an evening culinary worker performed tasks

---

[1]  There are two "Smith" decisions relevant to parole consideration, the first being *In re Mark Smith,* 109 Cal. App. 4th 489 (2003), and the second being *In re Ernest Smith,* 114 Cal. App. 4th 343 (2003.) Thus, references to those cases will include the first name of the petitioner.

asked of him, in a professional, responsible manner and was dedicated to insuring that all inmates were served their complete Thanksgiving Holiday meal. He was a positive example to other inmates and staff alike. Inmate Edwards is to be commended for his work ethic." Ex. B, p. 161.

"Inmate Edwards…was assigned as a student to the Computer Repair Technician Program… Over the past two years, he has worked extremely well with staff and inmates completing 1,719 hours in this program. He has an excellent work ethic, arrives to work on time and works diligently. With his desire to widen his working knowledge…he has accepted another challenge with a promotion to Team Leader-Printers. I would recommend him for any position within the computer field. He is an asset to this program. Continue the good work!" *Id.* at 182.

"Inmate Edwards has been employed as an Arts in Corrections worker for six months…He accomplishes his assigned duties in a timely fashion with a high degree of accuracy. He accepts criticism well and corrects those issues. He gets along well with his fellow workers, myself and other Education staff. His personality is an asset to the Arts in Corrections workplace." *Id.* at 146.

"Inmate Edwards is an "Active Member" in good standing with the Balanced Reentry activity Group (BRAG)…Mr. Edwards is commended for his participation and commitment to parole readiness." *Id.* at 140.

"[Edwards] has successfully completed 12 weeks of prescribed studies in the CRF-Central Chapel Discipleship Program: Christian Basics Class (C.B.C.). He has effectively acquired a practical knowledge the Christian *[sic]* role plays in today's society, as well as assimilating excellent methods in making moral life-choices while in prison or on parole. This student is to be commended for his efforts, participation, self-sacrifice, sincere dedication, and personal commitment displayed in this class." *Id.* at 144.

"Inmate Edwards has successfully completed a three day, eighteen hour Creative Conflict Resolution program. Inmate Edwards is to be commended for his diligence and work ethic. His participation was a positive influence on all involved." *Id.* at 191.

"Inmate Edwards…has successfully participated in and completed the Muslim Development Center's Anger Management Course. Inmate Edwards is commended for his outstanding participation and completion of the interfaith based Anger Management Course and was awarded a Certificate of Completion." *Id.* at 194.

5

### (1)    Vocational History

Mr. Edwards has a successful and full history of vocational training within the CDCR. He has worked in the prison Bakery, received a certificate in Vocational Computer Refurbishing-where he received excellent grades and laudatory chronos-, developed vocational skills in Printer Repair, including ink jet and laser repair and developed skills in Software Installation. Exh. B, p. 117.

### (2)    Educational History

Entering the CDCR with only an 11th grade education, Mr. Edwards has been committed to completing his high school education and earned his GED while incarcerated. Exh. C, p. 240. In addition, he has pursued college level education through Coastline Community College including: *Sociology 100*, *Succeeding in College*, *Introduction to Biology*, *Small Business Operation and Management*, *Business 120: Personal Financial Planning* and *Introduction to Psychology*. *Id.* at 241-246. Through the Valley Adult School, Mr. Edwards has taken *Real Estate Principles & Practices* and completed two courses in *Applied Business Mathematics*. *Id.* at 258, 260.

### (3)    Self Help & Therapy Program

Available to the Board in making its parole determination on September 29, 2005 was documentation of Mr. Edwards' longstanding and continuous participation in NA and AA. Exh. B, pp. 134- 201. Mr. Edwards' participation has been continuous since his 2003 hearing and documentation of his participation relates as far back as 1994 Exh. C, p. 275. Despite the fact that Mr. Edwards has never had an alcohol or drug addiction, nor did either substance play a role in the commitment offense, he has involved himself deeply in both programs as a means of achieving personal evolution. Exh. A, p. 50.[2] Furthermore, Mr. Edwards is a NA Chairman, a fact noted and applauded by the Board. Exh. B, pp. 134- 201. Moreover, Mr. Edwards studies the bible regularly in his efforts to acquire Christian values. He has participated in the Christian Basics Class where he received commendation for his "efforts, participation, self-sacrifice, sincere dedication, and personal commitment." (Exh. B, p. 144.)    Another demonstration of Mr. Edwards' commitment to faith-based rehabilitation is his completion of the twenty seven (27) study guides of the Amazing Facts Bible School. Exh. C, p. 269. In addition to his spiritual

---

[2] As noted by Dr. Macomber in his 2005 evaluation, "He [Mr. Edwards] does not have a significant history of drug use or alcohol. This was not a problem that was related to committing the offense. He's attended AA and NA for self improvement." Exh. A, p. 50.

self-help and development, Mr. Edwards has taken every chance available to further his emotional development by having successfully participated in and completed the following programs:  the Balanced Reentry Activity Group, the IMPACT workshop (a thirteen week program designed to teach about the impact of crime on victims), the three-day Creative Conflict Resolution Program, the course in the prevention, treatment and management of HIV/Aids, the Muslim Development Center's Anger Management Course, the course in the prevention, treatment and management of Tuberculosis, the Self Esteem Program, the Parenting Program, the Self Esteem for Lifers Group, the Emergency Management Institute's course Building for the Earthquakes of Tomorrow, the Music Relaxation Group Therapy, the Family Effectiveness Training and the Inmate Peer Education Program. *See generally* Exh. B, pp. 134-198.

The 2005 Board also had in front of it the psychological evaluation prepared by CDCR psychologist Dr. Macomber.  In this report, Dr. Macomber unequivocally pronounces Mr. Edwards safe to reintegrate into the outside community.  He states, "An assessment of dangerousness, based on his maturity and co-social attitudes, his potential for violence is below average in comparison to other inmates…As a result [of his bible study and self-improvement], his potential for danger in the community at this point in his life is no greater than the average citizen. Exh. A, p. 50. Dr. Macomber's report concludes with the pronouncement that Mr. Edwards' prognosis for successful adjustment in the community is ***excellent.*** *Id.* at 51.

### (4)    Parole Plans

In addition to evidence of Mr. Edwards' extensive self-help activities, academic achievement, spiritual growth and vocational gains, the Board was also presented with his realistic, well developed parole plans. Exh. A, pp. 23- 29. With regard to such plans, one Commissioner commended Mr. Edwards for "[P]utting together the nice comprehensive package for your hearing today." Exh. A, p. 72. The "comprehensive package" Mr. Edwards presented included his realistic goal of obtaining an AA degree upon parole and planning to counsel at risk youth to prevent them from making negative life decisions. Mr. Edwards has concrete plans to reunite with his immediate family in the county of last residence, with whom he has remained on close terms. In front of the Board was a support letter from Mr. Edwards' sister and brother in law who offered to provide him with a place to live, financial support, including transportation, and moral support. Exh. A, p. 25-26. The Board also considered a letter from Mr. Edwards' nephew, Jerome Curtis, detailing the importance of having his uncle in his life and the role he hopes his uncle will play once paroled. *Id.* Further, Mr. Edwards' mother provided a letter of

support and an offer of residential housing and financial support for her son. Exh. A, p. 27. Lastly, the Board reviewed an offer to Mr. Edwards of a position as a warehouse maintenance manager. Exh. A, p. 27. Yet despite such overwhelming support in the county of last residence, the Board still denied Mr. Edwards parole.

### (5)    Disciplinary Record

Mr. Edwards has never received a violence related disciplinary action. Exh. B, p. 199. Mr. Edwards has absolutely no history of gang affiliation or activity in over nineteen (19) years of incarceration. Exh. A, p. 50-51, Exh. B, pp. 102-103, 120. At issue in the most recent observation period was Mr. Edwards' one (1) Administrative CDC-115 and three (3) 128a counseling actions.[3]  However, none were for violent behavior.[4]  As stated in the 2005 psychological report authored by Dr. Macomber, " In considering his potential for dangerous behavior within the institutional environment, inmate Edwards has several minor disciplinaries. *These disciplinaries do not indicate a potential for dangerous behavior.* There is no evidence of possession of weapons, participation in riots, drug trafficking, or other dangerous behavior. *His last disciplinary was possession of a cooking utensil[5] that he used to cook food with in his cell. Based on his maturity and prosocial attitude, his potential for violence is below average in comparison to other inmates. "* Exh. B, p. 102. emphasis added. Moreover, two of the recent disciplines received were the result of miscommunications between Mr. Edwards and CDCR staff, including the refusal of staff to accommodate Mr. Edwards' debilitating knee injury when requesting he submit to a full body search. The circumstances of the recent disciplinaries were explained in detail to the Board during Mr. Edwards' 2005 hearing; specifically, Mr. Edwards explained, and the Board had the opportunity to evaluate his explanation, that on account of his knee brace, he could not move his leg as requested by staff. Exh. A, p. 43-44.

### D.  Parole Consideration History

---

[3]Mr. Edwards' disciplinary history includes the following since the beginning of his incarceration but not including the most recent observation period:  five (5) CDC 115's (refusing a direct order on 4-11-91; disobeying a direct order on 8-6-92; refusing a direct order on 11-03-95; threatening staff on 9-07-96; disobeying a direct order on 8-18-97), six (6) 128(a)s (absent without permission on 8-06-91; refusal to work on 6-10-91; delaying release in 1991; disobeying direct orders in May of 1996; infraction using work card on August of 1996 and disobeying verbal orders in 2000). Exh. B, p. 199. None of the previously stated disciplinary actions were violent. During the recent observation period, Mr. Edwards, as discussed, *supra,* received three (3) 128(a)s and one (1) Administrative 115 in 2004, again all non-violent.. Exh. A, pp. 41-42.

[5] On May 22, 2004, Mr. Edwards received an administrative 115 for keeping a pie tin in his cell with which he prepared occasional food items. Exh. A, p. 41.

8

**1. Initial Parole Consideration Hearing, March 15, 1999**

On March 15, 1999 Mr. Edwards attended his Initial Parole Consideration Hearing. At this hearing, the Board stated that he become discipline free, upgrade vocationally and educationally and participate in self-help and available therapy. Exh. B, p. 119. The basis for the denial as stated was that Mr. Edwards would pose an unreasonable risk or danger to others, based on the gravity of the commitment offense, which was "carried out in a manner that shows no regard for the life and suffering of other people." Exh. C, p. 220. Despite this determination, the Board commended Mr. Edwards for upgrading vocationally and educationally.

Parole was denied for four (4) years. Exh. C, p. 222.

**2.    First Subsequent (Second Overall) Parole Consideration Hearing, April 15, 2003**

On April 15, 2003 the BPT denied Mr. Edwards parole for the second overall time despite evidence of complete compliance with the Board's recommendations made in 1999, proof of comprehensive rehabilitation, demonstrated insight into the life crime, positive psychological evaluations from the CDCR's own psychologist and a positive Life Prisoner Evaluation Report prepared for the April 15th hearing. Exh. B, p. 112. In denying Mr. Edwards parole, the Board concluded that he would "pose an unreasonable risk of danger to others or a threat to public safety if released from prison" based on the fact that the "offense was carried out in an especially uncaring manner...the offense was carried out in a manner that demonstrates a disregard for your fellow human beings. The motive for the crime was inexplicable and it was very trivial in relationship to the offense was [sic] committed." Exh. C, p. 207. Ironically, the Board came to this decision in spite of demonstrated evidence of the very characteristics that would make Petitioner able to reintegrate into the community: realistic parole employment plans, strong residential plans, community support and full psychological clearance. Exh. C, p. 209. Moreover, the Board commended Mr. Edwards for his prowess in Computer Repair, Computer Refurbishing, his involvement in the Friends Outside programs, in Prevention/Treatment HIV/AIDS, Tuberculosis Prevention, Anger Management, Narcotics Anonymous and "just a host of other self-help programs." *Id.* at 210. However, the ***Board deemed that Mr. Edwards needed to continue to involve himself in self-help*** in order to better face and cope with stress. *Id.* at 209.

The Life Prisoner Evaluation Report submitted in preparation for the 2003 hearing made the following observations regarding Petitioner's progress since the Board's determinations in

1999: "He was discipline free with no CDC-115's. He upgraded vocationally, taking computer repair. He completed a Business Education Course through the academic education in-cell-study on his own time. He participated in available self-help programs. There are no therapy programs at CTF-II. *During this period, it appears that Edwards did what the BPT asked of him.*" Exh. B, at 119.

Parole was denied for two (2) years.

### 3. Second Subsequent (Third Overall) Parole Consideration Hearing, September 29, 2005

At this hearing, the hearing being the subject of the instant Writ of Habeas Corpus, the Board acknowledged the CDCR psychologist's recent favorable evaluation of Petitioner remarking that "the psychological report dated September 9, 2005, by Dr. Macomber states, is favorable and states that the inmate has no greater than that—of no greater risk of that of the average citizen." Exh. A, p. 71. The Board additionally noted that "The inmate has realistic parole plans in the county of last residence, he has several family members in which he can reside with, and who have offered him employment plans and he does have a marketable skill in welding." *Id.* at 71. Also before the Board was evidence of Petitioner's substantial educational achievements in the form of courses taken through Coast Line College and Valley Adult School. Further, Petitioner had submitted evidence of continuous participation and leadership in NA and AA, documentation of his outstanding effort and participation in the Power of Prayer program, numerous laudatory employment chronos and substantial documentation of participation in various self-help programs. *See generally* Exh. B, pp. 134-201; Exh. C, pp. 239-277.

However, in spite of the overwhelming evidence of rehabilitation, full psychological clearance, realistic parole plans and vocational upgrading, the Board baselessly denied Mr. Edwards parole for *four (4) years*. Its decision was premised on Petitioner's purported failure to "face discuss, understand and cope with stress in a non-destructive manner." Exh. A, p. 71. The Board further opined that "Until progress is made, the inmate continues to be unpredictable and a threat to others." *Id.* In the next breath, however, the Board stated, "the inmate should be commended taking his college classes at Coastline College, completing the vocational computer service, taking the real estate class, the involvement in project impact, serving the chair narcotics anonymous as well as numerous self-help activities." Exh. A, p. 72. Yet the Board concluded that "Never the less these positive aspects of his behavior do not outweigh his characters of unsuitability and in a separate decision the hearing panels that the inmate has been convicted of

10

murder, and it is not reasonable to expect that parole will be granted during a hearing in the next four years." *Id.* In issuing a baseless four (4) year denial, the Board ostensibly relied solely on the immutable nature of the commitment offense stating:  "[T]he commitment offense, the commit offense was committed in an especially cruel manner… And the offense was carried out in a manner which demonstrates an exceptionally callous disregard for human suffering." Exh. A, pp. 72-73. Moreover, the Board admitted that while Mr. Edwards had made incredible gains in prison, it [the Board] ***cannot merely look at evidence of rehabilitation*** because it "***can not ignore the crime.***" *Id.* at 74. A statement that is wholly contrary to current case law.

As will be discussed, *infra,* such characterizations, particularly that the offense was "cruel" and "demonstrate an exceptionally callous disregard for human suffering" are absolutely not supported by the evidence or judicial determinations.  Because the jury convicted Mr. Edwards of second-degree accomplice murder, based on the fact that he did not fire the shot killing the victim, it rejected any crime-based findings indicative of first-degree murder.  The Board's "findings" in 2005 are at odds with the unrefuted and positive psychological reports on file, Mr. Edwards' record of achievements, and the 2005 Board's own findings, thus exemplifying the Board's 2005 hearing as a sham.

### *THE LOS ANGELES COUNTY SUPERIOR COURT'S DENIAL*

It is respectfully submitted that the Los Angeles County Superior Court's decision denying Mr. Edwards's writ of habeas corpus was contrary to clearly established federal law and an unreasonable determination of the facts. The Los Angeles County Superior Court's decision failed to reflect the focus on ***current*** dangerousness and failed to relate the Board's allegations to any evidence that Mr. Edwards would pose a ***current*** risk of dangerousness if released.  See generally Exh. E.  As the Ninth Circuit maintained in *Hayward,* "California courts have made clear that the 'findings that are necessary to deem a prisoner unsuitable for parole are not that a particular factor or factors indicating unsuitability exist, but that a prisoner's release will unreasonably endanger public safety." 512 F.3d at 543. In its decision denying Petition's habeas writ, the Los Angeles Superior Court summarily addressed the issue of the unwarranted four (4) year denial stating that the Board must articulate reasons justifying denial but those reasons need not be completely different from those justifying the denial of parole.  Exh. E, pp. 313-315. The Superior court cites *In re Jackson*, 39 Cal. 3d 464, 479 (1985) in support of this proposition. Exh. E, p. 314.  Further, the court found that the Board's reasons for the denial, that "the

11

commitment offense was carried out in a calculated and dispassionate manner and was gang-related and he has received serious discipline," combined with Petitioner's need for additional therapy, were sufficient to justify the denial. Exh. E, p. 315. However, these are the exact reasons cited by the Board for denying parole in the first place. Thus, while the reasons need not be entirely different, *In re Jackson* contemplates that there be some difference between the reasons stated for denying parole and those articulated as a basis for a multi-year denial. *In re Jackson*, *supra*, 39 Cal. 3d at 479. This will be discussed more fully, *infra*.

The superior court merely recited the reasons cited by the Board to support the denial. Exh. E. Subsequently, both the California Court of Appeal and the California Supreme Court summarily denied the petitions. See Exh. F & G. There were no factual findings by any of the state courts to which the presumption of correctness of §2254 could be attached. As the Ninth Circuit in *Hayward* recently held:

> "[t]he test is not whether some evidence supports the reasons the Governor cites for denying parole, but whether some evidence indicates a parolee's release unreasonably endangers public safety. Some evidence of the existence of a particular factor does not necessarily equate to some evidence the parolee's release unreasonably endangers the public safety."

Hayward, 512 F.3d at 543 (quoting *In re Lee,* 143 Cal.App.4th 1400, 1408, 49 Cal.Rptr.3d 931 (2006)).*See also Jancsek v. Or. Bd. of Parole,* 833 F.2d 1389, 1390 (9th Cir.1987) (due process is satisfied if some evidence supports the decision). Here, the state courts failed to provide any evidence to support the decision upholding the Board's denial.

### *SUMMARY OF GROUNDS FOR RELIEF*

As will be seen, Petitioner's claim for federal habeas corpus relief is premised upon both prongs of the standards under the Antiterrorism and Effective Death Penalty Act (hereinafter, referred to as "AEDPA"), 28 *U.S.C.* § 2254(d)(1) and (2). The Court's jurisdiction is premised on the Board's violation of Mr. Edwards's due process rights, since the phrasing of *California Penal Code* §3041 creates a liberty interest in parole. As noted by the Supreme Court in *Greenholtz v. Nebraska Penal Inmates*, 442 U.S. 1, 12 (1979), under a federal due process analysis, the use of the mandatory "shall-unless" language in a parole statute creates a presumption that parole will be granted, absent the inmate falling into the statutory exception. See also *McQuillion I, supra*, 306 F.3d at 904-5; *Rosenkrantz v. Marshall* [hereafter "*Rosenkrantz VI*"], 444 F.Supp.2d 1063 C.D.Cal. (2006); *Sass v. California Bd. of Prison Terms* [hereafter

1    "*Sass II*"], 461 F.3d 1123 9th Cir. (2006); *In re Ramirez,* 94 Cal.App.4[th] 549 (2001), *In re*

2    *Rosenkrantz Rosenkrantz V,* 29 Cal.4[th] 616, 654 (2002) ["Accordingly, parole applicants in this

3    state have an expectation that they will be granted parole unless..."].  This gives rise to a due

4    process interest in parole, and absent a crime that is particularly egregious, as compared with

5    other similar offenses, the crime by itself cannot be a bar to a finding of suitability.  At a bare

6    minimum, the Board's crime based findings must be supported by some evidence in the record

7    which reasonably establishes that the inmate is currently dangerous.  *Scott II, supra,* 133 Cal.

     App. 4th at 594-595.

8        Yet, here, the Board has arbitrarily relied on the facts of the crime, despite knowledge

9    that Mr. Edwards' gun did not fire the fatal shot and that the acts of Mr. Edwards were not

10   particularly egregious, and the evidence failed to show him to be currently dangerous.  Given

11   Petitioner's almost two (2) decades[6] of positive programming, and his excellent profile, the

12   offense simply can no longer be relied on to support a finding that he falls into the public safety

13   exception to suitability.  Moreover, the last reasoned opinion was the Superior Court decision

14   that improperly relied on a claimed "finding" of current dangerousness, which lacked all record

15   support.  Thus, with respect to the substantive issue of the propriety of denying parole, Petitioner

16   will show his entitlement to relief under both the "contrary to" and the "unreasonable

17   determination" prongs of the AEDPA.  Under the "contrary to" analysis, Petitioner will show

18   that the state courts failed to apply the correct controlling United States Supreme Court authority

19   in denying Petitioner's habeas claim despite the lack of factual support in the record, particularly

20   under the Ninth Circuit's clearly announced standard in *Hayward, supra,* 512 F.3d. at 542-543.

21   Under the "unreasonable determination" clause, a two part analysis will be employed.   Initially,

22   it must be noted that the state court engaged in absolutely no fact finding, and the superior court

23   merely deferred to claimed "findings" of the Board that have never been subjected to any

24   meaningful appellate level review, and have imposed a standard that effectively negates the

25   burden of the Board to make factually supported findings that overcome the presumption

26   required by principles of federal due process under *Greenholtz* and *McQuillion I.*  Even if the

     state court's fact finding procedure could be said to survive the intrinsic review, the

27   determination below was so patently unreasonable and lacking in support in the record that no

28   rational court could have concluded that Mr. Edwards *currently* presents a threat of danger or

     that his crime was so egregious that a parole date could not be set.  *Hayward, supra; Scott II,*

     ---

     [6] Mr. Edwards had been incarcerated for seventeen (17) years at the time of his 2005 hearing.

     13

1    *supra*, 133 Cal.App.4th at 594-595.

2    Not only has Mr. Edwards personally shown his suitability for parole, but *California*

3    *Penal Code* §3041 also requires that a parole date normally be set for parole eligible prisoners

4    serving term-to-life sentences.  In the present case, throughout his over nineteen (19) years of

5    incarceration, Mr. Edwards has undertaken every possible step to improve his life, pay his debt

6    to society, and prepare himself for eventual release.  Mr. Edwards has been forthcoming and

7    remorseful about his crime.  However, despite the overwhelming evidence showing Mr.

8    Edwards's rehabilitation, the Board panels have continuously and arbitrarily denied him a parole

9    date and the findings by the California courts that these denials can be upheld even in the

10   absence of supporting facts are both unreasonable and wrong.  In sum, the evidence was

11   unrefuted that Mr. Edwards poses no significant risk of danger if paroled.  Indeed, at the

12   September 29, 2005 hearing, at issue herein, all of the evidence showed that Mr. Edwards was

     suitable in all respects, but he was again denied a date for parole, and no contrary showing was

     made.

13   In addition, the Board and subsequently, the state courts, violated Petitioner's due process

14   rights by allowing the Board to rely on unconstitutionally vague terms in order to deny parole.

15   As presented in *Rosenkrantz V*, "the nature of the prisoner's offense, alone, *can* constitute a

16   sufficient basis for denying parole." *Rosenkrantz V, supra*, 29 Cal.4th at 682 (emphasis added).

17   However, the California Supreme Court's subsequent *Dannenberg I*[7] decision has been relied on

18   by the Board as changing the standard set forth in *Rosenkrantz V*, allowing the Board to deny

19   parole based on the commitment offense if the inmate's crime was "more than minimally

20   necessary to convict him of the offense for which he is confined," a standard devoid of definition

     in statute or regulation. *Dannenberg I, supra*, 34 Cal.4th at 1095.  As noted by the dissent in

21   *Dannenberg I*, this standard is *completely* unreviewable.  *Id.* at 1102, emphasis added.  Thus, the

22   application is arbitrary in violation of due process of law, as it depends on the subjective and

23   personal opinions of the Board members. *Wolff v. McDonnell*, 418 US 539, 558 (1974) ["the

24   touchstone of due process is protection of the individual against arbitrary action of the

---

[7] There are now two (2) decisions regarding inmate Dannenberg, the most recent is under review by the California Supreme Court.  On November 16, 2007, the Court of Appeal reversed the Governor's finding of unsuitability based on the crime, affirming that the sole focus in parole suitability must be on current dangerousness. Even with a crime that initially satisfies that showing, with the passage of time, and in the face of clear evidence of rehabilitation, the commitment offense loses its probative value on the issue of current dangerousness.  That decision has since been taken under review by the California Supreme Court.  These decisions will be differentiated by the Roman numeral designations I and II.

14

government."]. As such, the Board has fully exploited and abused this carte blanche language to repeatedly deny parole based on the nature of the commitment offense, by effectively deeming **all** crimes exceptionally "heinous, atrocious and cruel." As will be seen, this has been done to improperly and arbitrarily deny Mr. Edwards's parole.

### LEGAL ARGUMENT

**I.    HABEAS CORPUS IS THE PROPER REMEDY BY WHICH TO TEST THE PROPRIETY OF A PAROLE DENIAL BY THE BOARD.**

This Court can entertain a petition for writ of habeas corpus "on behalf of a person in custody pursuant to the judgment of a state court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). Here, Petitioner's Due Process rights have been violated by the State Board of Parole Hearing's repeated refusal to grant parole despite Petitioner's federally protected liberty interest in parole.

This Court may grant Petitioner relief if it finds that the state court's adjudication on the merits "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceedings." 28 U.S.C. § 2254(d).

"Under the 'contrary to' clause, a federal habeas Court may grant the writ if the state court fails to apply to apply the correct controlling Supreme Court authority or it arrives at a conclusion opposite to that reached by [the Supreme] Court on a set of materially indistinguishable facts." *Williams v. Taylor*, 529 U.S. 362 (2000). Under the "reasonable application clause," relief is proper if the state court's application of clearly established law was both incorrect and unreasonable. *Id.* at 411. The Supreme Court has determined that the "objectively unreasonable" standard is more deferential than review for clear error. *Lockyer v. Andrade*, 538 U.S. 63, 75 (2003).

The Ninth Circuit has developed a two-part analysis when evaluating the state court's fact-finding under the "unreasonable determination" clause of § 2254(d)(2). First, an intrinsic review by the federal courts must be done to examine the state court's fact finding process. *Taylor v. Maddox*, 366 F.3d 992, 1000-1 (9th Cir. 2004). If the state court's fact-finding process fails this test, or if it did not engage in any fact finding, the state court decision is not accorded

15

any weight, or a presumption of correctness, and the federal court is free to fully re-evaluate the factual issues. It is only where state court's fact finding survives the intrinsic review, that the state court's findings are presumed to be correct. *Id.* at 1000. Even if the presumption of correctness applies, in applying 28 U.S.C. § 2254(d)(2), a federal court may still grant the writ if it concludes that the state court's adjudication of the claim "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceedings." 28 U.S.C. § 2254(d)(2). Thus, a petitioner can rebut the presumption of state court correctness by a showing based on clear and convincing evidence. *Id.* at 2254(e)(1).

Ordinarily, "a State's highest court is the final judicial arbiter of the meaning of state statutes." *Gurley v Rhoden*, 421 U.S. 200, 208 (1975). However, an exception to this is when it appears that the State's interpretation is an obvious "subterfuge" to evade the consideration of a federal issue. *Peltier v. Wright*, 15 F.3d 860, 862 citing *Mullaney v. Wilbur*, 421 U.S. 684, 691 (1975). The Supreme Court has further held that "[o]nce ambiguities as to the meaning of the statute are resolved, [the federal courts] may form [their] own judgment as to its operative effect." *Wisconsin v. Mitchell*, 113 S.Ct. 2194, 2199 (1993).

In applying § 2254 (d)(1) & (2) criteria, a federal court looks to the decision of the highest state court to have addressed the merits of a petitioner's claim in a reasoned decision. *LaJoie v. Thompson*, 217 F.3d 663, 669 n.7 9th Cir. (2000). It also looks to any lower court decision examined and adopted by the highest state court to address the merits. *Ylst v. Nunnemaker*, 501 U.S. 797, 803-04 (1991); *Williams v. Rhoades*, 354 F.3d 1101, 1106 9th Cir. (2004). Here, the Los Angeles County Superior Court issued a written decision, denying the petition on the theory that the Board's decision was supported by "some evidence." Exh. E. The Court of Appeal and California Supreme Court each issued summary denials. Exhibits F & G. The superior court did not make any factual findings, and thus there is nothing to which the "presumption of correctness" of §2254 can apply. The issue herein concerns the level of proof at the hearing regarding Mr. Edwards' current dangerousness, over seventeen (17) years after the offense and five (5) years beyond his minimum term at the time of his 2005 hearing. Obviously, he has already been sentenced, and that sentence includes the possibility of parole, so long as he is not a current and unreasonable threat to society. *Cal. Code Regs.*, tit. 15, §2402(a). Thus, the threshold issue is whether the Board even reached a conclusion that Petitioner is a ***current*** and unreasonable threat to society, which they did not. Even if such a finding had been made, such a conclusion finds no support in the record. The failure of the superior court to recognize the

16

correct focus of the review as being on *current* dangerousness, and its conclusion that the Board ruling was supported by "some evidence," is what Petitioner contends is improper.

## A. *PETITIONER HAS A FEDERALLY PROTECTED LIBERTY INTEREST IN PAROLE.*

The Board violated Petitioner's due process rights by failing to find him suitable for parole, thus depriving him of a liberty interest. The Fifth and Fourteenth Amendments prohibit the government from depriving an inmate of life, liberty or property without due process of law. U.S. CONST. Amends. V, XIV. In order to prove a violation of due process, an inmate must prove two distinct elements: (1) a deprivation of a constitutionally protected liberty or property interest, and (2) a denial of adequate procedural protections. *McQuillion v. Duncan*, 306 F.3d 896, 900 (2003) [hereafter "*McQuillion I*"]; *Brewster v. Bd. of Educ. of Lynwood Unified Sch. Dist.*, 149 F.3d 971, 982 9th Cir. (1998).

The United States Supreme Court in *Greenholtz v. Inmates of Nebraska Penal & Corr. Complex*, 442 U.S. 1, 7 (1979) concluded that a state's statutory parole scheme, if it uses mandatory language, may create a presumption that parole release will be granted when or unless certain designated findings are made, and such language gives rise to a constitutionally protected liberty interest in parole being granted. See also *Board of Pardons v. Allen*, 482 U.S. 369, 376-78 (1987) [Montana's parole statute which uses language that the board "shall" release prisoner, absent falling within the listed exceptions, creates a due process liberty interest in release]. Similarly, the Supreme Court found that the language of Nebraska's parole statute gives rise to a liberty interest in release on parole. *Greenholtz, supra*, 442 U.S. at 11-12 [concluding the use of "shall" in Nebraska's parole statute creates a due process liberty interest in release on parole]. Thus, where certain language is used that gives rise to a liberty interest in parole, a prisoner gains a legitimate expectation in parole and this liberty interest cannot be denied without adequate procedural due process protections. *Allen, supra*, 482 U.S. at 373-81; *Greenholtz, supra*, 442 U.S. at 11-16.

In California, it has been determined that *Penal Code* §3041, the statute that controls parole for life prisoners, uses mandatory language and is virtually identical to the language and schemes used in *Allen* and *Greenholtz*, thereby creating a protected liberty interest in parole release. *McQuillion I, supra*, 306 F.3d at 902; *see also, Michael v. Ghee*, 498 F.3d 372, 378 6th Cir. (2007); *Ellis v. District of Columbia*, 84 F.3d 1413, 1418 D.C. Cir. (1996); *Sass v. Board of*

1

*Prison Terms,* 461 F.3d 1123, 1128 (9th Cir. 2006); *Irons v. Carey* [hereinafter *Irons II*], 479

2

F.3d 658 (9th Cir. 2007) *Hayward v. Marshall,* 512 F.3d 536 (9th Cir. 2008).   Section 3041,

3

subsection (b) is the substantive standard which states:

4

> "The panel or board **shall** set a release date **unless** it determines that the gravity of
> the current convicted offense or offenses, or the timing and gravity of the current

5

> or past convicted offense or offenses, is such that consideration of the public
> safety requires a more lengthy period of incarceration for this individual, and that

6

> a parole date, therefore, cannot be fixed at this meeting." Emphasis added.

7

Accordingly, under the clearly established framework provided by the Supreme Court in

8

*Allen* and *Greenholtz, Penal Code* § 3041 creates a liberty interest in parole.  *McQuillion I,*

9

*supra*, 306 F.3d at 902; see also *Biggs v. Terhune,* 334 F.3d 910, 915-16 (9th Cir. 2003), and the

10

other Ninth Circuit cases cited above.   In light of these authorities, the Ninth Circuit has

11

unequivocally confirmed that California inmates continue to have a constitutionally protected

12

liberty interest in parole even after *Dannenberg I. Sass,* 461 F.3d at 1125; *Hayward, supra,* 512

13

F.3d. 536, 542-543; *Sprinkle v. Carey*, Slip Copy [2008 WL 564995] (E.D. 2008).  The court, in

*Sass,* relied upon the Supreme Court's reasoning in *Greenholtz* and *Allen* to conclude that a

14

statute's mandatory language creates a presumption that parole will be granted, and as such, a

15

cognizable liberty interest exists.  *Id.* at 1127. In doing so, it confirmed the decisions in

16

*McQuillion I* and *Biggs* when it concluded "California's parole scheme gives rise to a cognizable

17

liberty interest in release on parole" and a "liberty interest is created, not upon the grant of a

18

parole date, but upon the incarceration of the inmate." *Id.* at 1127 [citing *McQuillion, supra,* 306

F.3d at 902; *Biggs, supra,* 334 F.3c at 317].

19

Thus, because California prisoners have a constitutionally protected liberty interest in

20

parole release, neither the Board nor the Governor can decline to grant a parole date or rescind an

21

already granted date, without proper and sufficient procedural protections required by due

22

process. In denying Mr. Edwards parole for the third time, the Board denied him a cognizable

23

liberty interest.  As a result, he has clearly satisfied the first element in his claim, showing that he

has been deprived a constitutionally protected liberty interest.

24

25

> **II.    THE    STATE    COURT'S    DETERMINATION    WAS    BOTH
> UNREASONABLE AND WRONG.**

26

27

Under 28 *U.S.C.* §2254(d)(2), a federal court may grant habeas relief if a state court's

28

findings resulted in a decision that was based on an unreasonable determination of the facts in

light of the evidence presented in the proceedings in that court. 28 *U.S.C.* § 2254(d)(2). As held by the Ninth Circuit, the state court's decision must be both wrong and unreasonable. *Taylor v. Maddox*, 366 F.3d 992, 999 (9th Cir. 2004) [citing *Lockyer v. Andrade*, 528 U.S. 63, 75 (2003)]. Here, the actual fact finding is in the Board of Parole Hearings proceedings. No additional fact finding occurred at the superior court level, or in the court of appeal. Of course, no factual findings are possible in the California Supreme Court on a petition for review. To the extent that the California superior court engaged in "fact finding" of any type, it did so without the benefit of any process by which the parties could even participate.

In *Maddox*, the Ninth Circuit presented a two-part analysis under § 2254(d)(2). The Court stated that first, federal courts must undertake an "intrinsic review" of the state court's fact finding procedure. *Taylor v. Maddox, supra*, 266 F.3d at 1000.[8] If the state court's fact-finding process fails this test, the state court decision is not accorded any weight, and the federal court is free to fully re-evaluate the factual issues. The second part of the analysis is utilized only where state court's fact finding survives the intrinsic review, and then the state court's findings are presumed to be correct. *Id.* at 1000. However, even if the presumption of correctness applies, in applying 28 *U.S.C.* § 2254(d)(2), a federal court may still grant the writ if it concludes that the state court's adjudication of the claim "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceedings." 28 *U.S.C.* § 2254(d)(2). Here, no presumption applies, as no facts were found by the state courts.

### III. *CONTINUED RELIANCE ON THE COMMITMENT OFFENSE VIOLATES DUE PROCESS; THE IMMUTABLE FACTS OF THE CRIME NO LONGER HAVE PREDICTIVE VALUE AS TO PETITIONER'S CURRENT THREAT TO SOCIETY.*

#### A. *THE FOCUS IS ON CURRENT DANGEROUSNESS*

The rapidly growing body of current case law makes clear that a reviewing court must reverse a denial of parole by the Board or Governor when there is no reliable evidence which rationally shows that the inmate is ***currently*** dangerous. The decisions adopting this rule are

---

[8] The Court noted that the challenges to state court proceedings may be brought in a number of ways, for instance, "where the state court should have made a finding of fact but neglected to do so[;]…where the state court does make factual findings, but does so under a misapprehension as to the correct legal standard[;]…and, where the fact finding process itself is defective." *Taylor v. Maddox, supra*, 366 F.3d at 1000-01.

unanimous, with no published case now in existence[9] that rejects this rule. Not only does this include the state court cases of *In re Dannenberg [Dannenberg II]*[10] 156 Cal.App.4th 1387, (2007) [68 Cal.Rptr.3d 188, 196-197], *In re Scott  [Scott II]* 133 Cal.App.4th 573, at 594-595, (2005) [request for stay of inmate's release & request for depublication denied by Cal. Supr. Ct. at #S138430], *In re Lee* 143 Cal.App.4th 1400, 1408-1409, (2006) [req. for depubl. denied at S149411], *In re Elkins* 144 Cal.App.4th 475, at 499, 521, (2006) [pet'n for rev. & req. for depubl. denied at S148058; applic. for stay of inmate's release denied, at S147840], *In re Barker* (2007) 151 Cal.App.4th, 346, 365 [no pet. for rev. filed], *In re Weider*, 145 Cal.App.4th 570, at 589-590 [no pet. for rev. filed] (2006), and *In re Gray,* 151 Cal.App.4th 379, 383 [depubl. request denied at S153831] (2007), but this has now been adopted as the federal rule as well. *Hayward v. Marshall* (9th Cir. 2008) 512 F.Supp.3d 536, 543-545;[11]  *Hayward* follows in the wake of numerous Federal cases adopting this rule, including *Sanchez v. Kane*, 444 F.Supp.2d 1049 (C.D. Cal. 2006), *Rosenkrantz v. Marshall* [hereinafter *Rosenkrantz VI*], 444 F.Supp.2d 1063, at 1085 (C.D. Cal. 2006), *Thomas v. Brown*, 513 F.Supp.2d 1124, 1128-29 (N.D. Cal. 2006), *Brown v. Kane*, ___ F.Supp.2nd ___ [2007 WL 1288448] slip opn., p. 6 (N.Dist. Cal. 2007), *Blankenship v. Kane*, ____F.Supp.___[2007 WL 1113798] (2007 N.D. Cal), and *Martin v. Marshall*, 431 F.Supp.2d 1038 (N.D. Cal. 2006); *Sprinkle v. Carey*, Slip Copy [2008 WL 564995] (E.D. 2008). In adopting this rule, the Ninth Circuit specifically cited the state court decisions in *Dannenberg II, Lee, Elkins,* and *Scott II*, as well as the District Court decision in *Rosenkrantz VI*.  See *Hayward, supra*, 512 F.3d 536 at 543.  The  Ninth Circuit in *Hayward* also made it clear that it was adopting the analysis that was initially stated in *Biggs v. Terhune*, 334 F.3d 901, 916-917 (2003). *Id.* at 545. This now clearly refutes the typical claim of respondent that the statements in *Biggs* are dicta.

These decisions are clear that the key inquiry during an inmate's parole board hearing

---

[9]  The only case to ever take issue with this rule is *In re Jacobson*, 65 Cal.Rptr.3rd 222 [formerly at 154 Cal.App.4th 849] (2007), but the California Supreme Court recently accepted review of *Jacobson*, at S156416, and that decision is no longer citable authority. *Cal. Rules of Court* 28, 976, 977, 979. By accepting review, the Supreme Court removed the conflict among the appellate courts, and now, all the decisions reflect the requirement of focusing on current danger.

[10]  This case is currently under review by the California Supreme Court.

[11]  Additionally, the California Supreme Court has recently granted review in two other cases on this issue.  In the first, *In re Lawrence*, [rev. granted, previously at 150 Cal.App.4th 1151, 1562] (2007), the Court granted review after having already previously denied the request for stay of the inmate's release at S154018. In the second, *In re Cooper* (2007) [rev. granted, previously at 153 Cal.App.4th 1053], the Court had also previously denied the request for stay of that inmate's release as well, at S155130. Thus, while granting review of the legal issues, the Supreme Court was clearly agreeable with the ultimate result, a finding of a violation of due process by the Board's repeated denials of parole and felt that those inmates should be released.

1
2
3
4
5

should be whether or not there is "some evidence" of the inmate's current dangerousness; "[t]he test is not whether some evidence supports the *reasons* the [Board] cites for denying parole, but whether some evidence indicates a parolee's release *unreasonably endangers public safety*." *In re Lee* 143 Cal.App.4th 1400, 1408-1409, (2006) emphasis in original; see also, *In re Weider*, 45 Cal.App.4th 570, 589 (2006) ["[T]he overarching consideration in the suitability determination is whether the inmate is currently a threat to public safety"].

6
7
8
9
10
11
12
13
14
15
16
17
18

In recent litigation on these issues, Respondent has been arguing that the foregoing state cases are wrongly decided by each of those courts.    Notably, in making that argument, Respondent fails to even address the federal decisions on this same point, ignoring a significant batch of federal district court decisions, and now, the recent decision of the Ninth Circuit in *Hayward*, that each follow the teachings of *Scott II*, and which apply the same principles applied by the Courts in *Weider, Lee* and *Elkins*.  Of course, that issue is going to ultimately be decided in the *Lawrence, Cooper, Dannenberg II* and *Jacobson* cases, but in the meantime, those decisions are binding on the lower courts.  Even if it were necessary to attempt to discern what direction the California Supreme Court is headed on this issue, which the above cases obviously have already concluded requires a focus on current dangerousness that exercise would lead to the same result. The Court's direction is now clear from how they have been handling the cases coming before them in recent months.    While not yet speaking directly on the point, the California Supreme Court has by its actions tacitly approved nearly every one[12] of the state court decisions, refusing to hear, depublish or block the release of the inmates in each of them, and each of the federal cases are exclusively following the doctrine that was first stated in *Scott II*.

19
20
21
22
23
24
25
26

In *Scott II*, the First District announced the rule that the focal issue is current dangerousness, and with the passage of time, the probative value of the crime based evidence declines until it can no longer show the inmate remains a danger to society. *Scott II, supra*, at 594-595. As that court put it, the "circumstances of the crime reliably established by evidence in the record [must] rationally indicate that the offender will present an unreasonable public safety risk if released from prison." *Scott II, supra*, 133 Cal.App.4th at 595. Since then, this trend has been unanimously supported by the currently published case law, as cited above, including *Scott II, Barker, Gray, Elkins, Lee, Weider, Martin, Sanchez, Rosenkrantz VI, Willis, Thomas, Brown,*

27
28

---

[12]  Note that in two (2) of the cases, no petition for review, stay or depublication was filed by Respondent. As previously noted, in the two (2) cases where review was granted, *Lawrence* and *Cooper*, the request for a stay of the orders of release were denied by the Court, and those inmates were released.  Thus, in none of the cases has the Supreme Court taken any action evidencing displeasure with the analyses of the appellate courts.

*Blankenship*, and now the Ninth Circuit decision in *Hayward*. This was also the ruling in both *Lawrence* and *Cooper* before review was granted in those cases.[13] Importantly, all of these cases were decided subsequent to *Dannenberg I*, and the Supreme Court not only denied review of most[14] of these cases, they also refused the Governor and the Board's separate requests to block any of those inmates' release or to depublish the opinions. For example, as in *Scott II*, Respondent filed a petition for review in *Elkins*, along with a request for a stay of the decision in order to stop the release of that inmate. Both the petition for review and the stay were denied by the California Supreme Court in Case #S147840, obviously showing the Court's acceptance of its doctrine. In the most recent of the series of decisions involving inmate Robert Rosenkrantz, in reversing a denial by the Board, the Federal District Court ordered Rosenkrantz immediately released. *Rosenkrantz v. Marshall [Rosenkrantz VI]* C.D. Cal., (2006) 444 F.Supp.2d 1063. Concurrently with that decision, the Los Angeles County Superior Court came to the same conclusion, on nearly the same date, ordering Mr. Rosenkrantz released, and the 2nd District and the California Supreme Court each refused to block the order granting his release. 2nd DCA case # B192676; Cal. Supr. Ct. case #S145504.

The *Lee* decision is even more directly indicative of the Supreme Court's acceptance of the rules it states. In *Lee*, the Court of Appeal had originally denied the habeas petition. The petitioner filed for review in the California Supreme Court, and after briefing, the Court granted review and remanded the case back to the court of appeal, directing that they issue an order to show cause, and reconsider the denial. *In re Lee*, Case #S142267. The above cited published decision followed that remand. Then, on February 7, 2007 the California Supreme Court denied the Governor's request to depublish the *Lee* decision. Cal. Supr. Ct. Case #S149411.

Thus, these cases exist as valid authority, with the obvious approval of the California Supreme Court. As previously indicated, there are now no contrary decisions since the Supreme Court granted review in the case of *In re Jacobson*, [formerly at 154 CA4th 849], (2007) an isolated case that expressed disagreement with the above line of decisions. The Supreme Court obviously realized that they were eliminating the conflict among the Courts of Appeal on this issue, and by taking up *Jacobson*, the only rule they left in the published cases is the requirement that the focus be on current dangerousness. If that was not the correct focus, there would be no need to take up *Jacobson*, since a ruling that the courts can ignore the lack of a nexus to current

---

[13]  Note also that none of the above listed federal decisions have been reversed by the Ninth Circuit.
[14]  As previously indicated, review was granted in *Lawrence* and *Cooper*, but only after allowing those inmates to be released in light of the Board's actions in denying them due process by its reliance on the commitment offense.

dangerousness would not effect the outcome for the inmate in *Jacobson*, and any such ruling could be reached through any of the other cases pending in the Supreme Court. In other words, the release of the inmates in *Lawrence* and *Cooper*, coupled with the grant of review in *Jacobson*, itself shows the trend by the Supreme Court to adopt the current dangerousness standard.

Thus, the analysis is a two (2) step approach. First, as the court stated in the case of *In re Mark Smith*, 109 Cal.App.4th 489, at 509-505 (2003), the evidence must relate to a regulatory factor. The Court must first evaluate whether the regulatory factor is reliably established, and if so, consider whether the existence of that regulatory factor rationally provides evidentiary support for the Board's conclusion that the inmate remains currently dangerous. *Weider*, *supra*, 145 Cal.App.4th at 589-590; *Lee*, *supra*, 143, Cal.App.4th 1408; *Elkins*, *supra* 144 Cal.App.4th 499; *Scott II*, *supra*, 133 Cal.App.4th at 595; *In re Gray*, 151 Cal.App4th 379 [59 Cal.Rptr.3d 724, 740-741] (2007) [depubl. request denied at S153831]. Even if the crime is one that can be considered "particularly egregious" within the meaning of *Rosenkrantz V*, the inquiry does not end, and the Court must then analyze whether, in light of the passage of time, the number of parole suitability hearings, and in the face of overwhelming evidence of rehabilitation, the crime based regulatory factors can any longer provide evidentiary support for the conclusion that the inmate is currently dangerous. *Id*. See also *Hayward v. Marshall*, 512 F3d. 536 (9th Cir. 2008.

After over nineteen (19) years of incarceration, attendance in all of the relevant self-help programs, the receipt of exclusively positive psychologist's and counselor's reports, and the attainment of strong work skills and viable parole plans, the Board should have reached the only reasonable conclusions based on the facts: Mr. Edwards does not present a ***current*** threat to the community, and must be granted parole. Parole applicants have an expectation that they will be granted parole unless the Board finds that they are unsuitable for parole in light of the circumstances specified by statute and regulation. *In re Rosenkrantz* 29 Cal. 4th 616, (2002) certiorari denied (2003) 538 U.S. 980. Mr. Edwards' petition is a straightforward navigation of the statutory and regulatory parole scheme that is held in check by the California and United States Constitutions. Simply stated, (1) *Cal. Penal Code* § 3041 requires a parole eligible inmate to be released unless credible evidence establishes that he presents a current threat of danger to the public if paroled (see the cases cited above); (2) section 3041's regulatory companion, *Cal. Code Regs.*, tit. 15 §§2400 *et seq*. contains factors for the Board and Governor to consider in determining whether a parole applicant presents a current threat of danger to the community (*See*

*e.g., Cal. Code Regs.,* tit. 15 § 2402(c); (3) the courts have held that due process is met, and will uphold the Board or Governor's denial of parole, as long as "some evidence" supports the decision that the inmate currently presents an unreasonable risk of dangerousness, and; (4) while the commitment offense may initially serve as "some evidence" to support the denial of parole, over time, the ability of the commitment offense to serve as a predictor of current dangerous diminishes substantially to the point that it is no longer constitutes relevant, reliable evidence of dangerousness, and reliance on the offense becomes a due process violation.

### B. THE COMMITMENT OFFENSE IS A FACTOR THAT IS <u>INTIALLY</u> PERMITTED BY STAUTE AND THE REGULATIONS TO MEASURE WHETHER PETITIONER PRESENTS A CURRENT THREAT TO THE COMMUNITY; AFTER A PERIOD OF TIME, IT LOOSES ALL PREDICTIVE VALUE.

After almost (2) decades of incarceration,[15] excellent programming, and positive psychological evaluations, Mr. Edwards has reached the point where the commitment offense provides no evidence of current dangerousness.   The Board's reliance on the commitment offense to deny parole compels a finding of a due process violation.   The statutory and regulatory scheme used to determine parole suitability requires that the Board look to whether Mr. Edwards presents a current threat to the community.   The statutory linchpin of California's Parole scheme is *Cal. Pen.* Code § 3041.   This section requires that setting a parole date is mandatory "unless the Board determines that the gravity of the current convicted offense or offenses, or the timing and gravity of current or past convicted offense or offenses, is such that consideration of the public safety requires a lengthier period of incarceration."   *Cal. Pen. Code* § 3041(b).[16]   Thus, the heart of this provision is to determine whether a parole applicant presents a ***current*** danger. This comports with section 3041's regulatory companion that permits denial of parole only if the inmate will currently "pose an unreasonable risk of danger to society if released from prison."

---

[15] Seventeen (17)years at the time of the 2005 hearing.

[16] Mr. Edwards has a protected liberty interest in parole since *Cal. Pen.* Code § 3041 is a mandatory parole scheme. *See Greenholtz v. Inmates of Neb. Penal & Corr. Complex,* 442 U.S. 1, 7, 11-12 (1979) [Nebraska parole statute providing that the board "shall" release prisoner subject to certain restrictions, creates due process liberty interest in release on parole]; *Bd. of Pardons v. Allen,* 482 U.S. 369, 376-78 (1978) [Montana parole statute providing that the board "shall" release prisoner subject to certain restrictions, creates due process liberty interest in release on parole].) The Ninth Circuit has consistently followed the Supreme Court, finding that since California's parole scheme provides that the board "shall normally" release a prisoner subject to certain restrictions, this gives rise to federally protected liberty interest. *McQuillion v. Duncan,* 306 F.3d 895, 900 (9th Cir. 2002); *Biggs, supra,* 334 F.3d at 914-15.

*Cal. Code Regs.* tit. 15 § 2402(a). The Board was thus required by statute and regulation to determine if Mr. Edwards posed a current threat to the community.

The criteria used by the Board are contained within the regulations. *California Penal Code* section 3041 required that the Board promulgate criteria for determining parole suitability. "The [B]oard shall establish criteria for the setting of parole release dates and in doing so shall consider the number of victims of the crime for which the inmate was sentenced and other factors in mitigation or aggravation of the crime." *Cal. Pen.* Code § 3041(a). It was thus not only proper, but statutorily required that the Board create parole suitability and unsuitability factors to determine a parole applicant's current dangerousness. Section 3041(a)'s mandate to create parole criteria is set forth in *Cal. Code Regs.* tit. 15 § 2402 (Determination of Suitability). Section 2402(c) lists all factors that weigh against a finding of suitability. Specifically, the regulation permits the Board to consider as a factor weighing against suitability, whether the parole applicant "committed the offense in an especially heinous, atrocious or cruel manner." *Cal. Code Regs.* tit. 15 § 2402(c)(1). Accordingly, the Board may use the circumstances of the commitment offense as a factor to find Mr. Edwards unsuitable for parole, if the offense was "heinous, atrocious or cruel," ***but only if those factors show that he remains presently dangerous***.

As discussed below, however, the commitment offense cannot be considered in a vacuum, at the expense of other recent and more relevant factors. As the courts are now consistently holding, due process cannot ignore that repeated reliance on the offense as grounds for denying parole violated due process, as the crime will diminish to the point that the offense cannot serve as evidence of a current threat. *Scott II, supra,* 133 Cal. App. 4th 573; *Hayward v. Marshall, supra,* 512 F3d. 536; *Rosenkrantz VI, supra,* 444 F.Supp.2d 1063; *Martin, supra,* 431 F.Supp.2d 1038.

### C. AFTER NINETEEN YEARS[17] OF INCARCERATION AND POSITIVE PROGRAMMING, THE COMMITMENT OFFENSE NO LONGER HAS PREDICTIVE VALUE AS TO MR. EDWARDS' CURRENT DANGEROUSNESS.

To uphold the Board's denial based on the commitment offense, the court must find there was "some evidence" to support this finding. *Dannenberg I, supra,* 34 Cal. 4th 1061;

---

[17] Seventeen (17) years at the time of the 2005 hearing.

*Rosenkrantz V, supra,* 29 Cal. 4th 616; *McQuillion I, supra,* 306 F.3d 895, 904. While the commitment offense may have indicated Mr. Edwards' present dangerous for a period of time – and fulfilled the "some evidence" requirement – a series of cases have concluded that the Board cannot continuously rely on the crime as the basis for denying parole. Mr. Edwards' denial of parole by the Board falls squarely within these cases. After nineteen (19) years of incarceration, rehabilitation, the Board's continued reliance on the commitment offense to deny parole violates due process.

Recent case law makes clear that, assuming *arguendo,* some evidence exists to support a finding that the commitment offense is "especially heinous, atrocious or cruel" within the meaning of §2402(c)(1), due process still prohibits repeated reliance on those unchanging circumstances as grounds for finding an inmate unsuitable for parole in the face of evidence of rehabilitation. *Hayward, supra,* 512 F.3d. 535, 544-547. Accordingly, the Board in this case failed to address the appropriate legal concepts governing parole decisions under the United States Constitution, as they failed to acknowledge the complete lack of evidence of current dangerousness. *Lee, supra,* 143 Cal.App.4th at 1408-1409; *Weider, supra,* 145 Cal.App.4th at 589-590 [the "overarching consideration in parole suitability is current dangerousness]. Thus, the assertion that a regulatory finding is supported by "some evidence" does not end the inquiry. As the *Ramirez* court concluded,

> The United States Supreme Court had made it clear the 'some evidence' standard discussed in *Hill, supra,* 472 U.S. 445, is *only one aspect of judicial review for compliance* with minimum standards of due process. [Citation] … The court explained that the 'some evidence' standard applied only to questions of evidentiary sufficiency. It is *an additional requirement of due process, not a substitute for other established due process requirements.* [Citation.]

> Accordingly, were the Board to determine whether inmates are suitable for parole by flipping a coin, it could not insulate its proceedings from judicial correction simply by identifying 'some evidence' in the record to support each result. *Id.* pp. 563-564 [emphasis added].

In *Ramirez,* the court rejected the Board's contention that due process is satisfied by the mere fact that the hearing panel goes through the right litany of phrases and buzz words, divides the hearing into the relevant statutory and regulatory categories, and discusses the evidence relating to the individual inmate. The *Ramirez* Court described the Board's argument as follows:

> The Board … claims that 'due consideration' of [Ramirez's parole] application is demonstrated by the [Board's] references in its decision to the nature of Ramirez's crimes, his previous criminal record, his failure to correct his

26

criminality ..., his unstable social history, his need for therapy, and his 'institutional programming.' The Board argues that 'some evidence' supported its findings, because the record before it was replete with evidence relating to the factors relied on in the decision. *Id.* at 568.

However, the court concluded that the Board's decision "...was arbitrary in the sense that the Board failed to apply the controlling legal principles to the facts before it" and that the lack of support for the findings "supports Ramirez's claim that his parole hearing was a sham." *Id.* at 571. *Penal Code* §3041 requires that the factors relied upon, and supported by some evidence, must be factors that indicate a legitimate concern that the prisoner currently poses a threat to public safety if released. *See In re Ernest Smith*, 114 Cal. App. 4th 343 (2003); see also *In re Scott, supra,* 119 Cal. App. 4th at 890-892. The *Ramirez* Court acknowledged that there will always be "some evidence" to support a finding that a prisoner committed the underlying offense. Those facts alone, however, do not justify the denial of parole. Thus, while concluding that there was factual support for the findings as to the crime and priors, the *Ramirez* Court still found the Board's decision arbitrary since there had been multiple hearings, nine (9) years had passed beyond the minimum term, and it was seventeen (17) years after entering prison. *Id.* at 571. This was the first time that a court acknowledged that a finding could violate due process even though supported by "some evidence" in the record.[18]

Likewise, as the Ninth Circuit stated in *Biggs*, despite the fact that there may remain evidence to support a finding of egregiousness of the crime:

> A continued reliance in the future on an unchanging factor, the circumstances of the offense and conduct prior to imprisonment, runs contrary to the rehabilitative goals espoused by the prison system and could result in a due process violation.

*Biggs, supra,* at 916-917.

At this point, it is well established that the caution set forth in *Biggs v. Terhune, supra*, is in fact the standard. *Hayward v. Marshall*, supra, 512 F3d. 536. The rule is simply that the passage of time depletes the probative value of immutable, crime-based evidence as establishing current dangerousness. At some point, the predictive value of the crime is nonexistent. Here, even assuming that the commitment offense was "heinous, atrocious or cruel" as intended by section 2402(c)(1), too much time has passed, and too many other relevant factors have intervened during Mr. Edwards' incarceration, effectively nullifying the predictive value of the

---

[18] The California Supreme Court has never disputed these aspects of the *Ramirez* decision, only criticizing it to the extent that it required a comparison with other crimes for proportionality purposes.

27

offense to show current dangerousness.[19]

The denial by the Board of Mr. Edwards' parole grant is precisely the event the *Biggs* Court forewarned. Unlike Mr. Biggs, Mr. Edwards faced his third parole hearing, and not his first. Moreover, unlike Mr. Biggs, Mr. Edwards was convicted of accomplice second degree murder, not first degree murder. Mr. Biggs served only fourteen (14) years of his sentence for first degree murder before being denied parole, ***whereas Mr. Edwards has now served eight (8[20]) years over his minimum eligible parole date and two (2) years over his stated minimum sentence of seventeen years.*** Here, the only commonality between Biggs and Mr. Edwards is a dedication towards rehabilitation while incarcerated. The continued reliance by the Board on the commitment offense under these circumstances has resulted in a due process violation. Recently, the Ninth Circuit has clarified that the caution in *Biggs v. Terhune, supra*, 334 F.3d at 917, is in fact the standard. *Hayward, supra*, 512 F.3d 536, 546 (9th Cir. 2008). In *Hayward*, the Court adopted the rule that first began to develop from *Ramirez*, and which was clearly announced in *Scott II*, that the passage of time removes the probative value of the crime based evidence to establish current dangerousness when weighed against years of positive in prison behavior, until the predictive value of the crime is nonexistent. In doing so, *Hayward* cited approvingly the decisions in *Dannenberg II, supra, Lee, supra, Elkins, supra, Scott II, supra*, and *Rosenkrantz VI, supra. Hayward, supra*, 512 F.3d at 545.

In Mr. Edwards's case, the Board's unsuitability determination falls squarely within the scope of the above-mentioned cases. Such cases indicate that there is no litmus test as to the number of hearings that must occur before relief is appropriate, and no set pattern of behavior that must be met by the inmate to show rehabilitation, beyond the inmate serving his or her minimum term and showing positive evidence of rehabilitation. *Irons v. Carey [Irons II]*, 476 F.3d 658, 665 (9th Cir. 2007); *Hayward, supra*, 512 F.3d 535, 546, 546. It is the ***dramatic nature of the change undergone by the inmate that distances them from the crime***, not just temporally, but in the sense of no longer being the person who committed the offense, and no longer being subject to the issues that led to its commission. However, the one point that is simply beyond dispute is that Mr. Edwards has not just distanced himself from the crime temporally, but he has effectively dealt with every underlying issue that led him to commit the offense that the fact of its commission no longer has any meaning in assessing his current dangerousness, a rating that

---

[19]  As set forth previously, Mr. Edwards maintains his argument that the commitment offense does not satisfy the finding that the crime was "heinous, atrocious or cruel," and concedes this point only for this argument.

[20] Mr. Edwards had served five (5) years over his minimum eligible parole date at the time of his 2005 hearing.

28

1
2
3

every professional assigns to the lowest possible level. Moreover, psychological clearances authorized by the CDC's own clinicians have **repeatedly** indicated that there are no psychological impediments to Mr. Edwards's parole.

4
5
6
7
8
9
10
11

The rules announced in *Hayward*, *Biggs*, *Sass*, and *Irons II*[21] clarify the requisite nexus between the commitment offense and an inmate's current dangerousness in the context of parole denials.  In *Irons II*, the Ninth Circuit stated, "[a]ll we held in those cases [*Biggs* and *Sass*] and all we hold today, therefore, is that, given the particular circumstances of the offenses in these cases, due  process was not violated when these prisoners were deemed unsuitable for parole prior to the expiration of their minimum term." *Irons v. Carey [Irons II]*, 476 F.3d 658, 665 (9th Cir. 2007).  Although the Ninth Circuit concluded the petitioner in *Irons II* was not entitled to relief, the court did so based on the severity of his particular offense and the fact that he had not reached the end of his minimum term.  *Id.*  Immediately thereafter, the court specifically noted that

12
13
14
15
16
17

> [I]n *Sass* [*v. California Bd. of Prison Terms* 9th Cir. (2006) 461 F.3d 1123] and in the case before us there was substantial evidence in the record demonstrating rehabilitation.  In both cases, the California Board of Prison Terms appeared to give little or no weight to this evidence in reaching its conclusion that Sass and Irons presently constituted a danger to society and thus were unsuitable for parole.  We hope that the Board will come to recognize that in some cases, indefinite detention based solely on an inmate's commitment offense, regardless of the extent of his rehabilitation, will at some point violate due process, given the liberty interest in parole that flows from the relevant California statutes.

18

*Id.*, citing *Biggs, supra*, 334 F.3d at 917.

19
20
21
22
23
24
25
26
27

Thus, the Ninth Circuit made clear that once the inmate has passed his minimum term, as Mr. Edwards did eight (8) years ago, continued reliance on the commitment offense, despite clear evidence of rehabilitation can clearly violate an inmate's due process rights. *Hayward v. Marshall*, 512 F3d. 536;  see *Brown v. Kane* N.D. Cal. (2007) ___ F.Supp.2d ___ [2007 WL 1288448] slip opn., at p. 6, *Rosenkrantz VI, supra*, 444 F.Supp.2d 1063; *Martin v. Marshall* N.D. Cal. (2006) 431 F.Supp.2d 1038, *Thomas, supra; Blankenship, supra; Sanchez, supra*, 444 F.Supp.2d 1049, *Scott II, supra*, 133 Cal.App.4th 573, 594-595; *Lee, supra*, 143 Cal.App.4[th] at 1409; *Elkins, supra*, 144 Cal.App.4[th] 475; *In re Barker* 151 Cal.App.4[th] 346, (2007); *In re Gray* 151 Cal.App.4[th] 379, (2007).  Each of the above-referenced decisions shows that due process prohibits parole denial in the face of overwhelming evidence of rehabilitation where, due to the

28

---

[21] *Sass v. California Bd. of Prison Terms*, 461 F.3d 1123 (9th Cir. 2006); *Irons v. Carey [Irons II]* 476 F.3d 658 (9th Cir. 2007).

1   passage of time, there is no longer a nexus between the crime and the inmate's current level of
2   dangerousness.

3          A discussion of the case of *In re Elkins* (2006) 144 Cal.App.4th 475 (2006) is instructive
4   in this instance due, in part, to Elkins's age at the time of the offense. Elkins was convicted of
    first degree murder and robbery, with use of a deadly weapon, and was sentenced to twenty-five
5   (25) years to life. 144 Cal.App.4th 475, 504. Elkins and the victim were high school classmates
6   and drug dealing associates. *Id.* at 505. At the time of the offense Elkins was only nineteen (19)
7   years old. *Id.* The victim owed Elkins money for drugs and was bludgeoned to death by Elkins,
8   as he slept, with a baseball bat. *Id.* at 505-506. After the murder, Elkins took the victim's wallet,
9   money and drugs, dumped his body down a steep grade, continued to steal from the victim's
    storage unit and his girlfriend's home over several days then fled the state. *Id.* at 505.
10         In 2005, at his eleventh (11th) parole hearing, the Board concluded Elkins did "not pose
11  an unreasonable risk of danger to society or public safety if released from prison." *Id.* at 507.
12  Although the Board stated it was an "extremely vicious crime," they concluded the suitability
13  factors outweighed the commitment offense. *Id.* The Governor subsequently reversed the
14  Board's decision. *Id.* In rendering his decision, the Governor characterized the offense as
    "atrocious" and Elkins's actions after the murder as "cold and calculated." *Id.* 509-510. The
15  Governor then claimed the gravity of the offense, alone, was sufficient for him to conclude
16  Elkins was an unreasonable risk to public safety. Although Elkins had been incarcerated for
17  twenty-six 26 years and made "creditable gains," the Governor decided the offense outweighed
18  all the positive factors supporting his release. *Id.* Specifically, the Governor's decision relied on
19  two (2) factors: 1) Elkins's acceptance of full responsibility, over a decade ago, was too recent
20  and 2) the gravity of the commitment offense. *Id.* at 515-517. The court, however, concluded
21  that no minimum time requirement existed and instead found that acceptance of responsibility
22  works in favor of release "'no matter how longstanding or recent it is,' so long as the inmate
23  'genuinely accepts responsibility.'" *Id.*, quoting *Lee, supra*, 143 Cal.App.4th 1400. With regard
24  to the Governor's assertion that the offense "alone" was sufficient support for denial, the court
    noted that Elkins's ability to rob the victim without hitting him or hitting him just once does not
25  shed light on whether the murder was "especially brutal." *Id.* While Elkin's actions may have
26  shown an especially brutal robbery, they did not necessarily demonstrate an especially brutal *first*
27  *degree murder*. *Id.* Accordingly, the court concluded the Governor could not rely on the fact
28  that Elkins could have avoided the killing to show the murder was especially brutal, because such

action could not be considered "more aggravated or violent than the minimum necessary to sustain a conviction for that offense." *Id.* citing *Scott II, supra*, 133 Cal.App.4th at 598.

Ultimately, the court concluded "[g]iven the lapse of 26 years and the exemplary rehabilitative gains made by Elkins over that time, continued reliance on these aggravating facts of the crime no longer amount to 'some evidence' supporting denial of parole." *Id.* In delivering its decision, the court discussed extensively *Rosenkrantz VI, Martin*, and *Irons*, focusing on the fact that continued reliance on unchanging circumstances, to deny parole, despite years of positive institutional behavior, has no predictive value, and thus, such reliance is a due process violation. *Id.* at 521-523. Thus, the Governor's reversal of the Board's grant of parole lacked "some evidence" that Elkins posed "an unreasonable risk of danger to society." *Id.* at 523, citations omitted.

Here, Mr. Edwards has similarly served a lengthy period of incarceration, over nineteen (19) years, yet his case poses an even more compelling basis for relief. First, Mr. Edwards, unlike Elkins, was convicted only of second degree murder. Second, both Elkins and Mr. Edwards commitment the life crime at the age of nineteen (19), when their ability to make reasoned and independent decisions was severely marred by their youth. Mr. Edwards has been incarcerated for nineteen (19) years and served beyond his minimum term, similar to Elkins. Like Elkins, Mr. Edwards has matured tremendously during his incarceration and has programmed in an exceptionally positive fashion. Most importantly, the use of Mr. Edwards' offense as a predictor of current dangerousness is just as ineffective as it was in *Elkins*. Thus, reliance on immutable factors to continually deny parole, at this point, is a clear due process violation.

Likewise, in the case of *Thomas v. Brown*, recently decided by this Court, the Ninth Circuit's holding in *Sass* as it relates to *Biggs* was explained. *Thomas v. Brown, supra*, ___F.Supp.___[2006 WL 3783555] (N.D.Cal. 2006). This Court held that *Sass* "did not dispute" *Biggs'* principle that the passage of time does in fact reduce the probative value of the commitment offense. *Id.* at p. 5. This Court clearly stated that the ***only*** way that *Sass* limits *Biggs* was to do away with the notion that the commitment offense and pre-prison conduct could only be used to deny parole at the first hearing. *Id.* This Court explained that the principle still stood that the predictive value of the commitment offense to support the finding of unsuitability, decreases with the age of the crime. *Id.* As such, any assertion that continued reliance on the crime in this case is not a due process violation, considering the time lapse and clear proof of

rehabilitation and outstanding programming, is without merit. This notion has been recognized since the California Court of Appeal decision in the case of *In re Scott* [*Scott II*], 133 Cal.App.4[th] 573, at 594-595 (2005) clarified the role of the passage of time and multiple denials in eventually depleting the crime of any predictive value as to whether the inmate was currently dangerous. When the California Supreme Court denied review of *Scott II*, and refused to de-publish the decision or block that inmate's release, it started to become apparent that this was where the focus should be when reviewing denials of parole.

Furthermore, as discussed above, other significant federal cases have come down in the recent years that further establish these principles: *Martin v. Marshall* 431 F. Supp. 2nd 1038 (N. D. Cal. 2006), *Sanchez v. Kane* 444 F.Supp.2d 1049 (C.D. Cal. 2006), and *Rosenkrantz v. Marshall* [*Rosenkrantz VI*] 444 F. Supp. 2nd 1063 (C. D. Cal. 2006). These cases are directly on point, involving multiple denials of parole [four (4) in *Sanchez*, five (5) in *Martin* and six (6) in *Rosenkrantz VI*] and fourteen (14) or more years in custody. Finally, recent decisions, including the decision of this Court and the Court of Appeal, First District, *Lee, supra,* 143 Cal.App.4[th] 1400, and *Elkins, supra,* 144 Cal.App.4[th] 475, unanimously concluded that continued reliance on unchanging factors is not an adequate predictor of an inmate's current dangerousness to society, and as such, cannot be repeatedly relied upon by the Board. *Sanchez, supra*, 444 F.Supp.2d 1049; *Rosenkrantz VI, supra*, 444 F.Supp.2d at 1081-1082; *Martin, supra*, 431 F.Supp.2d at 1047; *Lee, supra*, 143 Cal.App.4[th] at 1409; *Elkins, supra*, 144 Cal.App.4[th] at 520.

Collectively, these rulings establish that the probative value of the crime as evidence establishing current dangerousness diminishes over time, eventually becoming legally non-existent, where it can no longer satisfy the "some evidence" standard. In sum, due process precludes continuous denials in the face of overwhelming evidence of rehabilitation, and where the passage of time forecloses any established nexus between the crime and an inmate's current level of dangerousness. Accordingly, the Board in this case failed to address the appropriate legal concepts governing parole decisions under the United States Constitution. To allow this to continue is to allow parole denials that are entirely politically motivated and pretextual in nature. Mr. Edwards' commitment offense happened *over nineteen (19) years ago*. He has sustained *three (3) parole* denials. As previously indicated, Mr. Edwards' incarceration has been infused with unparalleled religious, vocational and educational advancement, including numerous laudatory chronos from work supervisors, obtaining his GED and enrollment in college courses, leadership positions and participation within NA and AA, and substantial work in the area of

self-help. *See generally* Exh. B at 134-201; Exh. C, pp. 239-277. CDCR clinicians have explicitly stated that his violence potential is no greater than the average citizen in the community, that there is "no evidence of any diagnosable mental or emotional problems" that would pose a threat to the community, that "he fully acknowledges his contribution to the victim's death," that he feels sincere sorrow and regret, and that his "prognosis for successful adjustment in the community is excellent." *See* Exh. B, pp. 101-103; *see generally* Exh. B, pp. 99-107. Lastly, Mr. Edwards' parole plans are extensive and solid, exhibiting strong community support within the county of last residence, and he has never shown any behavior remotely indicative of violence potential while incarcerated. *See* Exh. B, pp. 94-98, 99-103. Clearly, Mr. Edwards has rehabilitated himself as much as possible within the confines of prison and exemplifies parole eligibility as set forth in the decisions previously discussed. The passage of time has depleted the probative and predictive value of his offense; thus, all that remains is irrefutable evidence of suitability.

Finally, the Board failed to consider Mr. Edwards' age at the time of the commitment offense and the role that immaturity played in Mr. Edwards' inability to engage in sound decision-making over nineteen years ago. As the *Barker* court made clear this year, the Board must take into consideration the age at which the inmate committed the life crime because this fact further diminishes the reliability of the crime in predicting future conduct. *In re Barker,* 151 Cal.App.4[th] 346 (2007). In *Barker*, the inmate assisted an older friend in the murder of that friend's family. Baker committed his life crime at sixteen (16) years of age *Id* at 352-353. Similar to the instant case, Barker's susceptibility to peer pressure and a strong need for acceptance drove his participation in the commitment offense. *Id* at 355-356. After a lengthy period of incarceration, Barker had a strong record of academic achievement, self-help activities, had demonstrated insight into his state of mind at sixteen and several vocational skills– similar to Mr. Edwards in most all respects. *Id.* The Court of Appeal found that the Board's "findings" that Barker 1) needed additional therapy to cope with stress in a non-destructive manner and 2) would remain a threat to public safety until such progress occurred were *not supported by some evidence. Id.* at 366-367. Importantly, the Board's *failure to take age into account at the time of the life crime* was highlighted by the court. *Id.* at 376. The court explained that age further diminishes the reliability of the commitment offense circumstances in predicting current dangerousness. *Id.* citing *Rosenkrantz v. Marshall, supra,* 444 F.Supp.2d at 1085. Moreover, specific to young criminals is "'*Their own vulnerability and comparative lack of control over*

*their immediate surroundings [which] means juveniles have a greater claim than adults to be forgiven for failing to escape the negative influences of their environment.*'" *Id.* quoting *Stanford v. Kentucky* (1989) 492 U.S. 361, 395, emphasis added.

Further, the United States Supreme Court held in *Roper v. Simmons* 543 U.S. 551 (2005), that juveniles are more vulnerable to negative influences, and because of their immaturity and transitory states, they cannot, with reliability, be classified among the worst offenders and are more able to reform and change due to their age. The Court further held that *this does not immediately change when the minor reaches majority. Id.* The Supreme Court held that three (3) distinctions exist between the juvenile and adult mental states that demonstrate that youth cannot be classified as amount the worst offenders. First, "[a] *lack of maturity and an underdeveloped sense of responsibility* are found in youth more often than in adults and are more understandable among the young. These qualities *often result in impetuous and ill-considered actions and decisions*." citations omitted, emphasis added. It has been noted that "adolescents are overrepresented statistically in virtually every category of reckless behavior." citation omitted. In recognition of the comparative immaturity of juveniles, almost every State prohibits those under 18 from voting, serving on juries, or marrying without citation parental consent. citation omitted.

The second area of difference is that juveniles are *more vulnerable or susceptible to negative influences and outside pressures, including peer pressure. Eddings v. Oklahoma* 455 U.S. 104, 115 (1982) ["[Y]outh is more than a chronological fact. It is a time and condition of life when a person may be most susceptible to influence and to psychological damage"]. This is explained in part by the prevailing circumstance that juveniles have less control, or less experience with control, over their own environment. citation omitted.

The third broad difference is that the *character of a juvenile is not as well formed* as that of an adult. The personality traits of juveniles are more transitory, less fixed. Citation omitted. *These differences render suspect any conclusion that a juvenile falls among the worst offenders*. The susceptibility of juveniles to immature and irresponsible behavior means, "*their irresponsible conduct is not as morally reprehensible as that of an adult.*" *Thompson v. Oklahoma* 487 U.S. 815, 835 (1988) plurality opinion, emphasis added. Their own vulnerability and comparative lack of control over their immediate surroundings mean *juveniles have a greater claim than adults to be forgiven for failing to escape negative influences in their whole environment. See Stanford v. Kentucky* 492 U.S. 361 395 (1989) [Brennan, J., dissenting]. The reality that juveniles still struggle to define their identity means it is *less supportable to conclude*

34

1   *that even a heinous crime committed by a juvenile is evidence of irretrievably depraved*
2   *character.* From a moral standpoint it would be *misguided to equate the failings of a minor*
3   *with those of an adult, for a greater possibility exists that a minor's character deficiencies will*
4   *be reformed.* Indeed, "[t]he relevance of youth as a mitigating factor derives from the fact that
5   the *signature qualities of youth are transient*; as individuals mature, *the impetuousness and*
6   *recklessness that may dominate in younger years can subside.*" *Roper v. Simmons* (2005) 543
    U.S. 551, 115-116, emphasis added. Given that the Court has stated that these differences do not
7   stop once the child hits majority, Mr. Edwards' actions cannot be deemed callous, cruel and
8   egregious.

9                                    ***Summary***

10       Courts at both the State and Federal level are no longer permitting the Board to deny parole
11   based solely on the commitment offense when it can no longer indicate present dangerousness,
12   especially when juxtaposed against subsequent years of incarceration.    It simply offers no
     evidence of current dangerousness.   Although no bright line rule exists specifying the exact
13   number of hearings or exactly how much time must pass before the commitment offense is no
14   longer an effective predictor of future dangerousness, a greater proof of rehabilitation decreases
15   the number of hearings and passage of time required to draw such a conclusion.   In the federal
16   system, because of the overlay of the Antiterrorism & Effective Death Penalty Act (AEDPA), 28
17   *U.S.C.* §2254, those courts must evaluate whether the state court decision is an unreasonable
18   application of clearly established federal law as announced by the United States Supreme Court.
     In this context, the rule has developed in federal habeas that the inmate must be beyond his or
19   her minimum term for a due process violation to occur.   *Irons II, supra*, 476 F.3d at 665;
20   *Hayward, supra*, at 10.

21       That missing nexus to current dangerousness exists in Mr. Edwards' case as well.
22   Clearly, the crime was situational, a one time act, founded on immaturity and unrealistic beliefs,
23   fueled by a desire to prove himself to his father. The extensive history of multiple psychological
24   reports show these issues to be fully resolved, with the doctors unequivocally concluding that
     Mr. Edwards poses no appreciable risk of danger if released. Mr. Edwards has no prior acts of
25   violence, and has been completely violence free since being incarcerated.   He has done
26   everything he can since committing this offense to rehabilitate himself.   Therefore, just as in
27   each of the cases listed above, there is no connection between Mr. Edwards' offense and his
28   present dangerousness, particularly in light of over nineteen (19) years of time served. As such,

the Board's decision to deny Mr. Edwards' parole was ill-founded.

### IV.    NO EVIDENCE EXISTS TO SUPPORT DENIAL UNDER §3401.

While "the gravity of the commitment offense or offenses alone *may* be a sufficient basis for denying a parole application," that can only be the case where the Board considers all other relevant factors. *In re Ramirez, supra,* 94 Cal.App.4th at p. 549[22] [citing *In re Seabock* 140 Cal.App.3d 29 (1983) at 37-38]; see also *In re Rosenkrantz [Rosenkrantz V],* 29 Cal.4th 616. Both the court of appeal in *Ramirez* and the Supreme Court in *Rosenkrantz V* emphasized that, while the gravity of the offense *may* be enough, that must be the *exception* to the rule, and the Board cannot *normally* deny parole based on the gravity of the offense. *Ramirez, supra,* at 549, *Rosenkrantz V, supra.* at 683. As the *Ramirez* court noted, "a life term offense or any other offenses underlying an indeterminate sentence **must be particularly egregious to justify the denial of a parole date.**" *Ramirez, supra,* 94 Cal.App.4th at p. 570, emphasis added. These principles were affirmed in *Rosenkrantz V, supra,* 29 Cal.4th at 683. The *Ramirez* court explained the legislative policy of parole for violent offenses, stating,

> "[T]he circumstances of *any* past offense, even any murder, are not necessarily a sufficient ground for the Board to refuse to set a parole release date. All violent crime demonstrates the perpetrator's potential for posing a grave risk to public safety, yet parole is mandatory for violent felons serving determinate sentences. Penal Code, §3000, subd. (b)(1). And the Legislature has clearly expressed its intent that when murderers who are the *great majority* of inmates serving indeterminate sentences approach their minimum eligible parole date, the Board '*shall normally set a parole release date.*' Penal Code §3041, subd. (a). The Board's authority to make an exception based on the gravity of a life term inmate's current or past offenses *should not operate so as to swallow the rule that parole is 'normally' to be granted.*" *Id.* at p. 570, emphasis added.

See also *Rosenkrantz V, supra,* 29 Cal.4th at 683, quoting the above language in relevant part. Therefore, it is simply fundamental that in order to overcome the rule that parole is "normally" to be granted, the Board must find that the commitment offense is among the gravest of offenses. The California Supreme Court's analysis in the case of *Dannenberg I, supra,* 34 Cal.4th 1061 (2005), at 1094, preserved these doctrines, stating that they were not overruling *Rosenkrantz V.* Furthermore, under the regulatory criteria, in determining if the crime is

---

[22] The California Supreme Court disapproved only of that portion of the *Ramirez* decision that requires a comparative, proportionality analysis of the crime with other similar offenses. The balance of the *Ramirez* decision was not overruled.

"particularly egregious" under those standards, due process demands that a comparative analysis be done with other similar offenses in order to avoid the entire regulatory scheme becoming unconstitutionally vague. This is true because the entire regulatory setup uses comparative terminology, such as "*especially* heinous, atrocious and cruel" or an "*exceptionally* callous disregard" for human life. *Cal. Code Regs.*, tit. 15, §2402(c)(1). It is Petitioner's contention that the Court's decision in *Dannenberg I* does not preclude such an analysis, and of course could not preclude it if required by the federal constitution. In fact, this is precisely how federal courts are interpreting *Dannenberg*. See *Sass*, 461 F.3d at 1125, 1127.

> ### 1. The Manner in Which Mr. Edwards Committed His Offense Does Not Demonstrate An Exceptional Disregard For Human Suffering or Exceptional Callousness or Cruelty or That It Was Calculated.

The relevant evidence directly refutes the Board's conclusion that Mr. Edwards committed his offense in an exceptionally callous and calculated manner. First, it should be acknowledged that Mr. Edwards was originally offered a plea for manslaughter. It must further be noted that Mr. Edwards was convicted under the theory of accomplice murder as it was not his gun, but his co-defendant's gun that fired the fatal shot. Based upon the rules under Title 15 of the *California Code of Regulations*, the Board is meant to consider the actions of a given inmate in determining the aggravated aspects of the commitment offense.

Here, there was nothing dispassionate or calculated about the commitment offense, and the Board's reliance upon these factors without supportive evidence is arbitrary and capricious. The "calculated" language actually comes from *Cal. Code Regs*, tit. 15 § §2402(c)(1)(B), which requires a finding that the "offense was carried out in a dispassionate and calculated manner, *such as an execution style murder*." Emphasis added. The term "execution style murder" has a particularized meaning in prison jargon, and a CDC memorandum was actually issued to define it as "those crimes wherein the victim was shot in the head after being bound or cuffed, made to kneel, made to lie down, or made to face a wall." Exh. H. No such actions occurred factually in this case. As found by the California District court the Board and Governor are consistently holding, erroneously, that a crime was cold or calculating, thus especially heinous under the regulations because there was a murder committed with a gun. *In re Gray, supra*, 151 Cal.App.4th at 405.

Furthermore, murder is always callous and cruel, and thus "all second degree murders by definition involve some callousness—i.e. lack of emotion or sympathy, emotional insensitivity, indifference to the feelings and sufferings of others." *In re Ernest Smith* 114 Cal.App.4th 343, 366

(2003). However, "parole is the rule, rather than the exception, and a conviction for second degree murder does not automatically render one unsuitable." *Id.* Indeed, in order to "demonstrate 'an exceptionally callous disregard for human suffering' (§2402, subd. (c)(1)(D)), the offense in question must have been committed in a more aggravated or violent manner than that ordinarily shown in the commission of [that offense]." *Scott I, supra,* 119 Cal.App.4[th] 871, 891.

Second-degree murder by definition ordinarily involves the intent to kill- the taking of the life of another with malice aforethought. Here, the theory of culpability was based on the same type of evidence that is routinely present in a 2nd degree murder, in fact, perhaps less, because it was accomplice based murder. These facts do not show a callous disregard for human suffering beyond that necessary to give rise to the showing of implied malice necessary for the crime of second degree murder. *Penal Code* §187. In determining the level of aggravation necessary, the court in a recent decision suggested that *In re Van Houten* 116 Cal.App.4[th] 339 (2004) illustrates the sort of gratuitous cruelty required to rise to the level of demonstrating "an exceptionally callous disregard for human suffering." *See Scott I, supra*, 199 Cal.App.4[th] at p. 891. The inmate in *Van Houten* was involved in the multiple stabbings of a pregnant woman with a knife and bayonet. While the woman lay dying, the victim was made aware that her husband was suffering a similarly gruesome fate. The *Van Houten* court noted that "[t]hese acts of cruelty far exceeded the minimum necessary to stab a victim to death." *In re Van Houten, supra*, 116 Cal.App.4[th] at p. 351. Further, other examples of aggravated conduct reflecting an "exceptionally callous disregard for human suffering," are set forth in Board regulations relating to the matrix used to set base terms for life prisoners. *Cal. Code Regs*, tit. 15 §2282, subdiv. (b)); *see also Scott, supra*, 119 Cal.App.4[th] at p. 892. The instant case is comparable to that of *In re Ernest Smith, supra*, 114 Cal.App.4[th] 343, where the court found that there was no evidence that the petitioner "tormented, terrorized, or injured [his victim]… or that he gratuitously increased or unnecessarily prolonged her pain or suffering." *Id.* at p. 367. In fact, the circumstance surrounding Petitioner's commitment offense is undeniably less callous that those in *Ernest Smith*. In *Ernest Smith*, the petitioner was found guilty of second-degree murder when he shot his wife in the head three times at point blank range, while her parents were in the next room. In assessing the commitment offense the *Ernest Smith* court concluded:

> "Was the crime callous? Yes. However, are the facts of the crime some evidence that [he] acted with exceptionally callous disregard for [the victim's] suffering; or do the facts distinguish this crime from other second degree murders as exceptionally callous? No."

*Id.*

In the present case, the relevant evidence shows no more callous disregard for human suffering than is shown by any second-degree murder offenses.

### 2. *Mr. Edwards was Offered a Plea for Manslaughter; Thus, the Board and District Attorney are Precluded From Pronouncing the Commitment Offense as Demonstrating a Callous Disregard for Human Life, Exceptionally Cruel or Calculated.*

Moreover, Mr. Edwards was actually offered the opportunity to plead guilty to a charge of manslaughter based on the same set of facts the Board *now argues demonstrate an "exceptionally callous disregard to human suffering."* Exh. A, pp. 68-69. To this point, revisiting the court's analysis in *Scott I, supra,* 119 Cal.App.4th 871 is appropriate. In *Scott,* as in Mr. Edwards' case, the inmate received a plea offer for manslaughter. The *Scott* court concluded "it is impossible to imagine prosecuting authorities would have made such an offer if they believed they could show Scott acted in a dispassionate and calculated manner, such as in an execution style murder." *Scott I, supra,* 119 Cal.App.4th 871, 890. The court placed great importance on the fact that a pretrial offer was made and as a result of that offer, determined that the Board and the District Attorney were precluded from characterizing the offense as something greater. Similarly, the District Attorney in the instant case made an offer of manslaughter to Mr. Edwards in exchange for testimony against his co-defendants. As mentioned *supra,* Mr. Edwards declined this offer based on fear of retaliation against his family; regardless, the *Board and the District Attorney are precluded from categorizing Mr. Edwards' crime as especially callous, cruel or egregious.* *Scott, supra,* at 890; Exh. A, pp. 55-56.

### 3. *Mr. Edwards' Motive Was Not Trivial.*

The final factor of commitment offense-unsuitability relied upon by the Board was its "finding" that the motive for the crime was "trivial."[23] §2402, subd. (c)(1)(E). The offense committed by most prisoners serving life terms is murder. Given the high value our society places upon life, there is no motive for unlawfully taking the life of another human being that could not reasonably be deemed "trivial". The Legislature has foreclosed this line of analysis, however, by determining that murderers with life sentences must "normally" be given release dates when they approach their minimum eligible parole dates. *Penal Code,* §3041, subd. (a). The governing statute also states that the Board shall set a release date "unless it determines that

the gravity of current convicted offense or offenses, or the timing and gravity of the current or past convicted offense or offenses, is such that consideration of the public safety requires a more lengthy period of incarceration for this individual, and that a parole date, therefore, cannot be fixed at this meeting." *Penal Code* § 3041, subd. (b).

This language means a "more lengthy period of incarceration" is called for where the gravity of the offense or offenses of the prisoner in question is *more indicative of a danger to the public if the prisoner is released than would ordinarily be the case.* The reference in Board regulations to motives that are "very trivial in relationship to the offense" therefore requires comparisons; to fit the regulatory description, the motive must be materially less significant (or more "trivial") than those which conventionally drive people to commit the offense in question, and therefore more indicative of a risk of danger to society if the prisoner is released than is ordinarily presented. The evidence does not permit this to be said of Mr. Edwards' motive. The Board's use of "trivial" in this instance can only mean that the Board views Mr. Edwards' motive as inexplicable. The *Scott I* Court, *supra,* noted the following regarding the Board's approach to determining motive:

> "The epistemological and ethical problems involved in the ascertainment and evaluation of motive are among the reasons the law has sought to avoid the subject. As one authority has stated, '[h]ardly any part of penal law is more definitely settled than that motive is irrelevant. An "inexplicable" motive, as we understand it, is one that is unexplained…[a] person whose motive for a criminal act cannot be explained or is unintelligible is therefore usually unpredictable and dangerous'." *Scott I, supra,* 119 Cal.App.4th at pp. 892-893 [quoting Hall, *General Principles of Criminal Law* (2d ed. 1960) at p. 88; *see also* Husak, *Motive and Criminal Liability* (1989) vol. 8, No. 1, Crim. Justice Ethics 3.]

Here, Mr. Edwards' motive is hardly "trivial" or "inexplicable" but rather excusable. At the time of the commitment offense, Mr. Edwards was *nineteen (19) years* old and unfortunately involved with other young men who were gang affiliates. Exh. B, p. 100. Although Mr. Edwards himself was not in any way affiliated with a gang, he did associate with friends from childhood whose social involvement was different from his own. Exh. A, p. 56-57. Such was the case on the night of the commitment offense where Mr. Edwards was currying messages between two groups of men in a dispute and made the poor choice to arrive armed. Exh. B, p. 100. His role as an outsider with social connections from basketball made him a natural mediator, a role he had assumed on the night of Mr. Hicks' death. A crucial fact the Board is all too willing to ignore in Mr. Edwards' case is that the bullet killing Mr. Hicks did

not come from Mr. Edwards' gun. Instead, it was shot from the gun of his friend. Exh. E, p. 313.) Mr. Edwards fully admits to his role in the death of Mr. Hicks and acknowledges that he exercised poor judgment in associating with his co-defendants and being armed. Exh. B, p. 102, 106-107. Mr. Edwards was in fact offered a plea to manslaughter in exchange for his testimony against these men. His decision not to take this deal, based on his fear of reprisal against his family who resided in the same neighborhood and had several younger children, is something he discusses with insight and regret. Exh. A, pp. 54-55. This far from being an inexplicable or trivial motive, Mr. Edwards is in essence being punished by the Board for his decision to protect his younger siblings from the fallout of testimony against his co-defendants. Based upon the foregoing facts, the Board's reliance upon the motive factor was arbitrary and capricious. Lastly, it is clear that the purpose of the assessment related to motive is to determine the possibility of recidivism and the violence potential of Mr. Edwards. In the present case, Mr. Edwards' violence potential has repeatedly been *found to be low or on average with persons in the outside community*. Exh. B, pp. 102-103, 107. Thus, the motive factor may not be used to find Mr. Edwards unusually unpredictable and dangerous.

## V.   *ASIDE FROM THE COMMITMENT OFFENSE, THE OTHER REASONS CITED BY THE BOARD FOR DENYING PETITIONER'S PAROLE FOR A THIRD TIME ARE NOT INDICATIVE OF UNSUITABILITY.*

While the Board's *third overall* parole denial contained several reasons for denying Mr. Edwards, it is apparent that the Board relied solely on the commitment offense. As discussed *supra*, this factor is now null and void, and the Board's reliance thereon amounts to a due process violation. The rest of the Board's reasons for the reversal are either not permitted by statute, regulations or case law, or simply do not constitute evidence of unsuitability. Aside from the commitment offense, the totality of the factors that the Board may consider includes:

> **(2) Previous Record of Violence**. The prisoner on previous occasions inflicted or attempted to inflict serious injury on a victim, particularly if the prisoner demonstrated serious assaultive behavior at an early age. **(3) Unstable Social History**. The prisoner has a history of unstable or tumultuous relationships with others. **(4) Sadistic Sexual Offenses**. The prisoner has previously sexually assaulted another in a manner calculated to inflict unusual pain or fear upon the victim. **(5) Psychological Factors**. The prisoner has a history of severe mental problems related to the offense. **(6) Institutional Behavior**. The prisoner has engaged in serious misconduct in prison or jail.

*Cal. Code Regs. tit.* 15 § 2402(c), emphasis added. The fact that the Board would persistently cite reasons that clearly are not permitted by statute, regulation or case law, confirms that the

41

intention was to list as many purportedly negative characterizations of Mr. Edwards as possible, in the hopes of obfuscating the requirements of the parole scheme and due process that the decision focus solely on current dangerousness.

### 1. Petitioner's Purported Lack of Insight Into His Criminality.

There are two points of contention here. First, the Board's assertion that Mr. Edwards "lacks insight" resembles a psychological finding wholly contrary to recent CDCR clinician reports indicating that he suffers absolutely no psychological impediments to parole. Exh. A, pp. 101-103. In his latest psychological evaluation, Dr. Macomber stated, "He fully acknowledges his contribution to the victim's death. He does feel sorrow, remorse, guilt, and poor judgment on his part. His feelings appear to be sincere and genuine. Exh. A at 102. Furthermore, the Board's finding is in direct contravention to the requirements of *Penal Code* §5011 that states that the prisoner is never required to admit to the commitment offense. The fact that the Board is using this against him is in direct contravention to *Cal. Code Regs.*, tit. 15, § 2236, which states that the prisoner shall not be required to admit or discuss the crime and a refusal shall not be used against him. Moreover, Mr. Edwards expressly explained to the Board his own insight gained after nineteen (19) years of incarceration stating: "Well today I'm my own person and I make own choices. I don't fall to the words of someone else. I'm not a follower in that aspect." Exh. A, p. 36. However, in spite of Petitioner's own words demonstrating insight and the full clearance of CDCR psychologists, declaring Petitioner had contemplated his role in the commitment offense and felt sincere regret, the Board still premised its denial on Mr. Edwards' purported lack of insight. *See generally* Exh. A, pp. 70-77.

The Board further stated that "The inmate has programmed in a limited way and this programming includes the disciplinaries. And misconduct while incarcerated shows that you failed to demonstrate evidence of positive change." Exh. A, p. 70. Specifically, the Board discussed three (3) 128a counseling chronos and one (1) CDC-115 administrative disciplinary report. However, according to the CDCR's own psychologist, the party with the most professional competence in determining the weight of Mr. Edwards' disciplinary history vis-à-vis his parole suitability, states: "*These disciplinaries do not indicate a potential for dangerous behavior*. His last disciplinary was possession of a cooking utensil that he used to cook food with in his cell." Exh. B, p. 102, emphasis added. The Board questioned Mr. Edwards on his disciplinary infractions and Mr. Edwards was very forthcoming about the incidents. He

42

explained that in one instance, he attempted to communicate with the correctional officer and request that the officer treat him a more respectfully. The result of this attempt at honest communication was a 128(a). A second inquiry was targeted at an incident that occurred on October 14th, 2000, when an officer requested that Mr. Edwards submit to a full body search. Mr. Edwards explained to the officer that he could not move his leg on account of his knee injury. Unfortunately, this interaction resulted in a disciplinary action. Exh. A, pp. 40-44.[24] Thus, it is clear that Mr. Edwards' disciplinary history comes not from his inability to follow directions and submit to orders but from his attempts to communicate within the prison environment.

Consistent with the focus of §3041, which is clearly on determining whether an inmate poses a current risk of danger to the community, it is difficult to imagine that the above discussed violations, although some classified as "serious" misconduct under *Cal. Code Regs.*, tit. 15, § 3314(b), should form the basis for a finding of parole unsuitability in the midst of an otherwise wholly positive record. There is nothing in Mr. Edwards' record that is even remotely indicative of violence potential. Further, the Board's characterization that on account of Mr. Edwards' disciplinary record, "[A] longer period of observation and evaluation of the inmate is required before the inmate is suitable for parole" simply due to these rules violations is nothing short of egregious. Exh. A, p. 73. Although Mr. Edwards does not herein challenge his CDC-115 or 128(a) violations, *they are clearly not indicative of the overall progress he has made while incarcerated.*

### 2. SELF-HELP AND THERAPY

The Board puzzlingly "found" that Mr. Edwards "has programmed in a limited manner." Exh. A, p. 70. Further, the Board inexplicably ordered a new psychological evaluation in its recommendations, despite explicitly acknowledging that Dr. Macomber, his latest evaluating psychologist, was *wholly supportive of release.* Exh. A, p. 71. There is absolutely no evidence to support the Board's "finding" with regard to Mr. Edwards' psychological status. In an even more egregious display of arbitrariness, the Board commented that "*We're going to request another psychological evaluation because we just don't feel that this one really explored what we need to explore, so we would ask you to cooperate with clinicians in the completion of a*

---

[24] The Board also cited to a disciplinary action against Mr. Edwards for being found in possession of two packages of *chocolate chip cookies* and exiting the shower room behind schedule. *See generally* Exh. A, pp. 40-44.

43

*new evaluation."* Exh. A, p. 74, emphasis added. Aside from Mr. Edwards' extensive record of self-help activities, particularly in the area of religious enlightenment, psychological evaluations spanning the last eight years have indicated that Mr. Edwards' parole suitability *should not* be based on psychological factors. Consider the following statements made by his last two evaluating clinicians:

> "There is *no evidence of mental or emotional problems in this case that would interfere with granting a parole date*...His *prognosis for successful adjustment in the community is excellent.* Exh. B, p. 103 [Dr. Macomber's 2005 psychological evaluation].

> "[Mr. Edwards] has grown a great deal since his youthful crime and availed himself of education upgrading, vocational training and self-help groups within the prison. *His release should be based upon other than psychiatric factors.*" Exh. B, p. 107 [Dr. Gattozzi's 1999 psychological evaluation].

Further, these psychologists have consistently determined that Mr. Edwards' violence potential is substantially below average and that he does *not pose a current threat* to the community. Given these reports, authored by CDCR psychological professionals, the fact that the Board even mentions psychological factors in its third denial defies logic. Mr. Edwards' last psychological evaluation, conducted in 2005, clearly provides a current clinical position unlikely to change, showing that Mr. Edwards will never require extensive therapy.

### 3. PETITIONER'S JUVENILLE RECORD

Lastly, the Board purported to deny Mr. Edwards' parole on the basis of prior arrests that occurred in 1985 and 1986 when he was a juvenile, stating "[T]he inmate has failed to profit from society's previous attempts to correct his criminality and the attempt includes juvenile camp." Exh. A, p. 70. The Board further opined, "And the inmate also has some unstable—or has some prior criminal arrests and convictions for concealed- for carrying a concealed weapon in 1985 and 1986." However, in *Cal. Code Regs.*, tit. 15, §2402(c)(2), the Board provided that an offender's "Previous Record of Violence" is a factor indicating unsuitability. *See also Rosenkrantz V, supra*, 29 Cal.4th at 653. The Board's regulation does not provide that a "previous record of any crime" indicates unsuitability. Even more telling, however, is that the Board's rules specifically require that an *absence of violence* in a prisoner's life as a juvenile (*Cal. Code Regs.*, tit. 15, §2402(d)(1)) and/or as an adult (§2402(3)(5)) must be considered as factors supporting a grant of parole. See also, *In re Mark Smith, supra,* 109 Cal.App.4th 489

44

["Although a 'previous record of violence' (meaning an attempt to inflict serious injury or other 'assaultive behavior') is a circumstance tending to establish unsuitability for parole (*Cal. Code Regs*, tit. 15, §2281(c)(2); *In re Rosenkrantz, supra*, 29 Cal.4th at p.653), there is nothing in the governing statutes or regulations to support the Governor's reliance on *Smith's* non-violent criminal record."].) Those are the Board's own rules and they cannot arbitrarily be ignored.

In the case at bar, the Board gave no consideration, much less proper consideration, to these factors as required by statute and regulation, and certainly had absolutely no factual basis for a claim that Mr. Edwards currently presents an unreasonable risk of violence if released. In short, as case law has made clear, regulatory factors indicating unsuitability, refer to violent priors, thus, reliance on Mr. Edward's almost twenty two (22) year juvenile adjudications are without merit. *In re Mark Smith, supra*, 109 Cal.App.4th at 504-505; *see also Scott I, supra,* 143 Cal.App.4th at 601-02.

It is clear that the Board's underlying reason for denying Mr. Edwards' parole, in spite of lip service paid to other regulatory factors, is the immutable circumstance of the commitment offense. As W.H. Auden remarked about the crime of murder, "Murder is unique in that it abolishes the party it injures, so that society has to take the place of the victim and on his behalf demand atonement or grant forgiveness; it is the one crime in which society has a direct interest." W.H. Auden, 1907-1973. This quote elucidates the role of the CDCR vis-à-vis Mr. Edwards. The Board's role presents a challenge as it must, as contemplated by Auden, both punish and forgive. Here, the penal system and the Board have, for nineteen (19) years "demanded atonement" for the commitment offense. Mr. Edwards has not only served time above the seventeen (17) years to which he was sentenced, he has committed to and succeeded in generating the religious and emotional rehabilitation necessary for society to grant forgiveness. Given Mr. Edwards' educational, spiritual, and emotional growth, the Board's decision to deny him parole on September 29, 2005, based on the immutable facts of the commitment offense, despite hollow citations to other factors, is nothing short of an abuse of the provisions set forth in the California regulations and the due process rights provided in the California Constitution and the Constitution of the United States.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**VI.    THE BOARD VIOLATED PETITIONER'S DUE PROCESS RIGHTS WHEN IT REFUSED TO RECONSIDER HIS PAROLE SUITABILITY FOR ANOTHER FOUR YEARS, WITHOUT ANY SUBSTATIATED REASON.**

In denying Petitioner parole for an unwarranted *four years (4)*, the Board stated: "[T]he inmate has been convicted of murder, and it is not reasonable to expect that parole will be granted during a hearing in the next four years,  And specifically, the reasons for this are the commitment offense, the commit offense was committed in an especially cruel manner" and that "the offense was carried out in a manner which demonstrates an exceptionally callous disregard for human suffering" and "that the motive for the crime is very trivial in relation to the offense." Exh. A, pp. 72-73.  In its decision denying Petition's habeas writ, the Los Angeles Superior Court summarily addressed the issue of the unwarranted four (4) year denial stating that the Board must articulate reasons justifying denial but those reasons need not be completely different from those justifying the denial of parole.  Exh. E, pp. 313-315.  The Superior court cites *In re Jackson*, 39 Cal. 3d 464, 479 (1985) in support of this proposition.  Exh. E, p. 314. Further, the court found that the Board's reasons for the denial, that "the commitment offense was carried out in a calculated and dispassionate manner and was gang-related and he has received serious discipline," combined with Petitioner's need for additional therapy, were sufficient to justify the denial.  Exh. E, p. 315.  However, these are the exact reasons cited by the Board for denying parole in the first place.  Thus, while the reasons need not be entirely different, *In re Jackson* contemplates that there be some difference between the reasons stated for denying parole and those articulated as a basis for a multi-year denial.  *In re Jackson*, *supra*, 39 Cal. 3d 464, 479.

Thus, the Board's and the Superior court's decision ignores the distinction made by the parole statute.  On the one hand, an unsuitability finding requires that the Board find that "'consideration of the public safety requires a more lengthy period of incarceration…The postponement provision, on the other hand, requires a finding that 'it is not reasonable to expect that parole would be granted at a hearing during the following year…The first determination attempts to predict the risk to public safety, while the second attempts to predict that the risk is likely to continue for at least as long as the period of postponement.  Although they are related, they are not identical." *In re Jackson*, *supra*, 39 Cal. 3d 464, 478.  The Jackson Court further clarifies this issue stating:

This holding does not mean that the reasons for refusing to set a parole date must

46

necessarily be completely different from the reasons for excepting an inmate's case from annual review...The [denial] may involve some of the same facts on which the unsuitability determination is based. What is required, however, is an identification of reasons which justify the postponement...'[t]the crucial factor...is that the record reflect recognition...that [the Board] is making a separate and additional choice...'" *Id.* at 479 citing *People v. Belmontes* (1983) 34 Cal. 3d 335,348.

In the instant case, the record does not reflect the above delineated crucial factor, and as such, it cannot be said that the Board made a separate and additional choice to deny Mr. Edwards' parole for an additional four (4) years. Rather, the Board restated the exact same reasons it provided for finding Mr. Edwards parole unsuitable; thus, conflating the two inquires and treating them as identical, in contravention to the holding of *Jackson. In re Jackson, supra*, 39 Cal. 3d 464, 478. Furthermore, the Board must relate the allegations to actions that in fact support the denial. Here, the Board cannot relate the possession of a pie plate one (1) year earlier to the allegation that because of that, Mr. Edward's will remain an unpredictable risk of danger for four (4) more years. Moreover, the Superior court's decision, finding that the Board's decision to deny a parole hearing for four (4) years was not in error, was ***contrary to the requirements of clearly established state law and wrongly decided.*** Here, despite the issuance of two (2) year denial at Mr. Edward's previous hearing, the Board substantially extended his period between hearings without a justifiable explanation.

The circumstances of the crime act to determine the appropriate term to be served by an offender and not to preclude parole altogether. Parole exclusion is permitted only for the most serious first degree murders with special circumstances. Mr. Edwards is convicted of second degree murder, which is parole eligible. The Board is authorized to set the term for Mr. Edwards' crime at a period longer than the standard term prescribed by the matrix if they feel the crime warrants a greater term. *Cal. Code Regs.* tit. 15 §2403. They are not permitted to convert the entire sentence to LWOP, however. Therefore, there must be more reason to deny subsequent parole consideration for four (4) years than the mere fact that Mr. Edwards committed the crime.

In sum, the denial of parole was an abuse of discretion, as it is not supported by facts in the record that would establish an inability of Mr. Edwards to attain parole suitability for four (4) years, particularly in the face of the overwhelming evidence of his rehabilitation. Mr. Edwards has already served nineteen (19) years, denying him four (4) years would mean that he will have served twenty three (23) years on a 17-to-life crime before being eligible for another parole

hearing. There cannot be *less* evidence of future dangerousness than is present now. What's even more absurd about using the crime itself to deny parole for four (4) years is that nothing about the crime itself will have changed in five (5) years. *In re Morrall*, 102 Cal.App.4th 280 (2002) ["[I]t would be contrary to the statutory scheme to deny parole simply because the commitment offense was murder"].)

Thus, even if the denial of parole is found to be supported by the evidence, Mr. Edwards is entitled to receive the presumptive denial of one (1) year as prescribed in *Penal Code* §3041.5, as there is no basis for giving a longer denial given his outstanding programming..

## VII. THE STATE COURT'S RULING IS CONTRARY TO CLEARLY ESTABLISHED SUPREME COURT LAW AS IT RELIES ON LANGUAGE THAT IS UNCONSTITIONALLY VAGUE.

In evaluating an inmate's suitability for parole, the Board is only permitted to come to a finding of unsuitability if the inmate currently presents an unreasonable risk of danger to society if paroled. *Cal. Code Regs.*, tit. 15, §2402(a); *Scott II, supra*, 133 Cal.App.4th 594-595. The regulations only permit such a finding to be based on the crime if the offense is "especially heinous, atrocious or cruel." *Cal. Code Regs.*, tit. 15, §2402(c)(1). That term is further defined by the regulatory criteria as applying only when the murder is of a particularly egregious type, fitting certain defining principles set out in the regulations.[25] As will be discussed, these criteria are overly vague, leaving inmates unable to determine if the criteria should properly apply to their particular offense. However, in defending its actions in these cases, the Board takes the position that the standard enunciated in *Dannenberg I* somehow allows them to ignore even these rules, authorizing the denial of parole to be based solely on the crime so long as it has facts which are "more than minimally necessary to convict" the inmate of the offense in question, irrespective of whether the offense meets the regulatory criteria for particularly egregious murders under 2402(c)(1). Such an interpretation, if adopted, would render the regulatory criteria so unconstitutionally vague as to literally read them right out of the books. Of course, as the court noted in *Scott II, supra*, 133 Cal.App.4th at 594-595, not only must the Board's finding

---

[25] Section 2402(c) goes on to define the categories of sufficiently egregious offenses as being ones where "(A) multiple victims were attacked, injured or killed in the same or separate incidents. (B) the offense was carried out in a dispassionate and calculated manner, such as an execution-style murder. (C) The victim was abused, defiled or mutilated during or after the offense. (D) The offense was carried out in a manner, which demonstrates an exceptionally callous disregard for human suffering. (E) The motive for the crime is inexplicable or very trivial in relation to the offense."

48

fit within the regulatory criteria, but they must rationally and reliably show that the inmate is currently dangerous. Here, there was no factual support for any of the Board's crime based findings, yet the state court's decision attempts to rationalize a third denial of parole based on the crime, under the theory that the offense involved facts which were more than the "minimum necessary to sustain a conviction" for second degree murder.

In the present case, the Board denied Mr. Edwards parole at his 2005 hearing based solely upon the commitment offense, characterizing it as being "carried in a manner which...demonstrates an exceptionally callous disregard to human suffering" and that "the offense was carried out in a calculated manner" and "the motive for the crime very trivial to the relation to the offense." Exh. A, pp. 68-69. While purporting to be "findings" about the crime, the use of these phrases without adequate explication shows that the Board was doing nothing more than reading off of the denial from, BPT 1000a, rather than coming to some definitive conclusion about the pertinent offense factors. As applied to this case, these findings are unconstitutionally vague.

The first criteria used by the Board in denoting cruelty and callous disregard is not a criteria in the actual regulatory terms. *See Cal. Code Regs.*, tit. 15, §2402(c)(1)(D.) Although the Board did later recite the applicable phrase verbatim, no inmate would anticipate the application of this criterion, particularly in these circumstances and in light of the applicable rules defining what it means for a crime to be "especially...cruel." *In re Ernest Smith*, *supra*, 114 Cal.App.4[th] 343 ["There is no evidence that Smith acted with cold, calculated, dispassion; or that he tormented, terrorized, or injured (the victim) before deciding to shoot her; or that he gratuitously increased or unnecessarily prolonged her pain and suffering"]; *see also Sanchez v. Kane* 444 F.Supp.2d 1049 (C.D. Cal. 2006); *Rosenkrantz VI, supra*, 444 F.Supp.2d 1063; *Martin v. Marshall*, *supra*, 431 F.Supp.2d 1038; *Lee, supra*; *In re Elkins*, *supra*, 144 Cal.App.4[th] 475. Further, disregard for human life, cruelty and callousness are part of the element of malice (*see* CALJIC 8.11), which is necessary for any murder conviction. Thus, the Board's allegations are inconsistent with Mr. Edwards' second-degree accomplice murder conviction. In fact, the only evidence the Board presented in support of its "findings" regarding the callousness of Mr. Edwards' offense was its statement that "even though it was the middle of the night, there is no telling what other individuals could've been in the area." Exh. A, p. 69. This cursory discussion of Mr. Edwards' purported callousness can hardly be viewed as evidence rising to the level of the applicable criteria, even if it was appropriate to employ such criteria.

A statute (or regulation) is void for vagueness "if it fails to give adequate notice to people of ordinary intelligence concerning the conduct it proscribes, or if it invites arbitrary and discriminatory enforcement." *United States v. Doremus* 888 F.2d 630, 634 (9th Cir. 1989). In addressing a vagueness challenge, the first question is "whether to scrutinize the statute for intolerable vagueness on its face or whether to do so only as the statute is applied in a particular case." *Schwartzmiller v. Gardner*, 752 F.2d 1341, 1346 (9th Cir. 1984). As will be discussed herein, the factors set forth in *Cal. Code Regs.*, tit. 15, § 2402(c) used by the Board to determine whether the crime was committed in an especially heinous, atrocious or cruel manner, as applied, are purely subjective, and as applied, are unconstitutionally vague. As such, these factors are not easily understood or explained, thus, Mr. Edwards did not have notice that they would apply to his crime.[26]

The Court in *Rosenkrantz V* held that "the nature of the prisoner's offense, alone, *can* constitute a sufficient basis for denying parole." *Rosenkrantz V, supra*, 29 Cal.4th at 682, emphasis added. The *Rosenkrantz V* decision employed conditional language that the offense "can" constitute such a basis, but only if the crime could reasonably be considered *more* aggravated or violent than the minimum necessary to sustain a conviction for that offense, meaning the crime had to be particularly egregious compared to other similar offenses so that the exception of 3041(b) would not "swallow the rule" that parole "shall normally" be granted. *Id.* at 683, emphasis added. Although the *Rosenkrantz V* language itself, if not properly tempered by the rules addressed in *Scott II, supra*, 133 Cal.App.4th at 594-595, can lead to the regulations being interpreted in a manner that would render them unconstitutionally vague, the Court in that decision did at least state a directive that sole reliance on the commitment offense will violate the prisoners' due process rights pursuant to *Penal Code* §3041(a) in situations where the offense "could [not] be considered *more* aggravated or violent than the minimum necessary to sustain a conviction for that offense" and was therefore "particularly egregious." *Rosenkrantz V, supra*, 29 Cal.4th at 683. The language requiring that the offense be "particularly egregious" was understood to mean that the offense stood out among similar offenses as being significantly more violent. See *e.g., In re Ernest Smith, supra*.

---

[26] It is important to note at the outset that the California Supreme Court has determined in cases involving the death penalty or life without the possibility of parole, the virtually identical terms found in §2281(c)(1), "especially heinous, atrocious, or cruel, manifesting exceptional depravity," are unconstitutionally vague and violative of fundamental due process. *Superior Court of Santa Clara v. Engert*, 31 Cal.3d 797, 805 (1982). The U.S. Supreme Court has likewise found that phrase infirm in the death penalty context. See discussion, *infra*.

1    However, under the Board's interpretation of *Dannenberg I*, the standard set forth in
2    *Rosenkrantz V* is dramatically changed, allowing the Board to deny parole based on the
3    commitment offense, without regard for its comparative egregiousness, solely because they can
4    "point to some evidence" that the crime was merely "more than minimally necessary to convict
5    him of the offense for which he is confined." *Dannenberg I, supra,* 34 Cal.4th at 1095.[27] Of
     course, the *Dannenberg* majority made it explicitly clear that they were not overruling
6    *Rosenkrantz V* or watering down its rules.  This interpretation urged by the Board would
7    fundamentally alter the standard by removing the focus from determining whether the crime
8    was "especially heinous, atrocious and cruel" so as to show current dangerousness, as long as
9    there is simply more evidence than "minimally necessary to convict."  This formulation would
10   then take the place of determining whether the crime was egregious under the regulatory
11   standards of *Cal. Code Regs.,* tit. 15, §2402(c)(1), on which inmates routinely rely to evaluate
12   whether their particular crime could potentially take them outside the standards of suitability. In
13   fact, as has been argued by the Board in other cases, and will presumably be argued here, the
14   decision of the Board must be upheld under this standard, even if the evidence does not show
15   that the inmate currently presents an unreasonable risk of danger if released, as is expressly
     required by *Cal. Code Regs.,* tit.15, §§2281(a) and 2402(a).    See *Scott II, supra,* 133
16   Cal.App.4th at 594-595.  Obviously addressing this very argument, *Scott II, supra,* clarified the
17   basic holding in *Dannenberg I*, concluding that the crime "***can***" justify a parole denial, but only
18   where it rationally shows current dangerousness, in light of the reduced probative value that the
19   crime based evidence naturally has after the passage of time.  Of course, the Board did not
     extend to Mr. Edwards the benefit of the wisdom of *Scott II*.
20       As noted by the dissent in *Dannenberg I*, utilizing this standard in the way suggested by
21   respondent, without the caveat of *Scott II*, makes the Board's decision ***completely***
22   unreviewable.  *Id.* at 1102, (emphasis added).  What may be callous or heinous, under this view
23   of the standard, to one Board member may not be such to another.  However, the Court made it
     clear in *Dannenberg* that they were not intending to alter the standard of *Rosenkrantz V*
24   *Dannenberg, supra,* 34 Cal.4th at 1094, and *Scott II* helped to clarify that crime based denials
25   still needed to be closely monitored, and that the law still retained the fundamental requirement
26   that the focus be on the regulatory standards and their ability to show, despite the passage of

27

28   [27] As the dissent in *Dannenberg I* pointed out, viewing the standard in this light makes it completely unreviewable. *Dannenberg I, supra,* 34 Cal.4th at 1102.

time, that the inmate is *currently* still presenting an unreasonable risk of danger to society if paroled. *Scott II, supra*, 133 Cal.App.4th at 594-595. The Board's narrow view of the basic holding in *Dannenberg I* sees it as effectively amending the standard in a way where every life term offense could fit into the category of "more than minimally necessary to convict" by virtue of the simple fact that the inmate was convicted and thus the evidence is presumptively greater than the "minimum necessary to convict." This application is wholly arbitrary and depends on the subjective, personal opinions and whims of the Board members. Of course, the Board has fully adopted this stance, and thus abused its position by treating *Dannenberg I* as carte blanche language to repeatedly deny parole based *solely* on the nature of the commitment offense, by simply mouthing the words "especially heinous, atrocious, and cruel." This position permits a conclusion that can easily be reached by those Board members who want to claim that the facts of any murder are more than those minimally necessary for conviction. Since the *Dannenberg* Court dispensed with the requirement that the offense be compared to other murders *for proportionality purposes*, the Board seizes on that language to avoid comparisons for *any* purpose, even evaluating whether the crime fits under the indisputably comparative language of the regulations, §§2281(c)(1) and 2402(c)(1) (*"especially* heinous..." or *"exceptionally* callous disregard...," etc., emphasis added). Thus, under their view, the standard can be said to fit any life term offense, including those based on accomplice liability, DUI based car accident, non-intentional (implied malice) killings, and the like.

An example in the context of a murder case can easily illustrate the unworkability of this view of the *Dannenberg I* standard, where the caveat of *Scott II* is ignored. Assume two separate murders committed in an identical fashion by first time offenders. In each case, the perpetrator contemplates the idea of killing just long enough to satisfy the element of premeditation and deliberation, and both harbor express malice, i.e., intent to kill. However, the jury in defendant A's case decides to credit some psychological evidence on mental state and finds only a second degree murder, while the jury in defendant B's case rejects the identical evidence and convicts of first degree. Under the Board's view of the *Dannenberg I* formulation, only defendant A's crime, the second degree murder, exhibits evidence that is "more than minimally necessary" to convict, since premeditation is a required element of defendant B's 1st degree murder offense. Thus, defendant B would be entitled to have his parole date fixed at his initial hearing, absent adverse in-prison behavior, as the evidence of premeditation is simply one of the elements of his crime. However, under the Board's view of

52

*Dannenberg I*, they would be free to repeatedly deny parole to defendant A, based on the evidence of premeditation that was rejected by the jury.[28]  In other words, all other facts being equal, the Board's view of the *Dannenberg* formulation results in the second degree murder being treated as more serious than the identical first degree offense, committed by an identical offender.  Such a rule flies in the face of due process.

Applying the rule explained by the United States Supreme Court, there is nothing in the language and descriptions used in § 2402(c)(1) ["exceptionally heinous, atrocious and cruel"] that standing alone "implies any inherent restraint on the arbitrary and capricious" denial of parole suitability.  *Godfrey v. State of Georgia* 446 U.S. 420, 428, (1980).  That Court found that a "person of ordinary sensibility could fairly characterize almost every murder as [exceptionally heinous, atrocious, cruel or callous]."  *Id.* at 429.  The Court thus determined that for death penalty purposes, the terms "especially heinous, atrocious or cruel" are unconstitutionally vague.  *Maynard v. Cartwright* 486 U.S. 356, 361-364, (1988).  As applied to death penalty cases, the Supreme Court felt that terms such as "heinous" and "atrocious" could be used by any reasonable person to characterize every murder so as to fall into those categories.  *Shell v. Mississippi* 498 U.S. 1, 3, (1990); *Maynard v. Cartwright, supra*, 486 U.S. at 363; *Godfrey v. Georgia, supra*, 446 U.S. 420, 428-429.  As previously discussed, the California Supreme Court has also found that in **both** death penalty or life imprisonment without possibility of parole, the terms "especially heinous, atrocious, or cruel, manifesting exceptional depravity" are unconstitutionally vague and violative of fundamental due process.  *Superior Court of Santa Clara County v. Engert* 31 Cal.3d 797, 805, (1982).  However, the paroling authority is using those terms to repeatedly deny parole, effectively converting parole eligible sentences into an LWOP.  As such, the use of those terms here is even more insidious, as these offenses are indisputably parole eligible, and the repeated use is effectively allowing terms that are unconstitutional when used to impose an LWOP sentence to be used to turn these cases into LWOP sentences.  In other words, the same result occurs without the same protections.

Thus, the analysis must start from the premise that the regulatory language is already unconstitutionally vague, by its reliance on the phrase "especially heinous, atrocious and

---

[28] The constitutionality under federal law of the California Supreme Court's allowance of this in *Rosenkrantz V*, where the offense was *de facto* treated as a first degree murder, despite an express acquittal of that charge by the jury, is not at issue here, as there is indisputably no evidence to support such an analysis in this kidnap case. Should the Court deem that to be an issue herein, leave is requested to further brief that point.

cruel." *Cal. Code Regs.*, tit.15, §2402(c)(1). However, rather than attempting to establish a definition that would serve to correct, or at least mitigate, the problem, the Board seeks to eviscerate the standard altogether, proffering an unworkable definition and substituting it for the regulatory criteria of "especially heinous, atrocious and cruel." As previously discussed, any murder can fit this standard, and if adopted, the regulatory terms will entirely lose their ability to distinguish the more egregious murders from those of a comparatively lesser seriousness. Furthermore, respondent's version of the standard does not make any effort to discern whether the presence of evidence that is "more than minimally necessary to convict" has any tendency in reason to establish the sole focal question in parole suitability: does the inmate currently present an unreasonable risk of danger if paroled? *Cal. Code Regs.*, tit.15, §2402(a); *Scott II, supra,* at 594-595. As such, adopting this view of the *Dannenberg I* formulation renders the regulatory standards unconstitutionally vague.

Here, upholding the Board's crime based findings under this view of the standards, in effect, waters down even further the already vague terminology ("especially heinous, atrocious and cruel") by substituting an entirely different standard that could fit any murder related offense. However, as explained by the United States Supreme Court, these terms were already constitutionally deficient, as they do not possess any inherent restraint to prevent an arbitrary or capricious application. *Godfrey v. State of Georgia, supra*, 446 U.S. at 428. Furthermore, by the California Supreme Court's own analysis, the terms used were unconstitutionally vague even before given the extremely broad veil that respondent urges under the "more than minimally necessary to convict" standard. *Superior Court of Santa Clara County v. Engert,* 31 Cal.3d 797, 805,[29] (1982). As such, the argument that Mr. Edwards' crime was sufficient to justify the Board's denial of parole must be rejected.

///
///
///

---

[29] The decision in *Engert* applied to death penalty and LWOP cases. However, this creates a loop-hole through which, if not corrected, the Board and courts would be allowed to apply unconstitutionally vague concepts to parole eligible term to life sentences, in order to effectively turn the sentence into an LWOP by repeatedly using the crime to deny parole.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

### CONCLUSION

Based on the foregoing, it is clear that Petitioner is both eligible and suitable for parole, and in light of the Board's own conclusion that he no longer presents a danger to society, the continuous denial of a parole date amounts to a deprivation of Mr. Edwards' Federal and state Constitutional and statutory rights. Accordingly, it is respectfully requested that this Court issue a writ of habeas corpus, or order to show cause, directed to the Board, to inquire into the legality of Petitioner's incarceration, and after briefing and an evidentiary hearing, if necessary, issue an order to release Mr. Edwards from actual and constructive custody, and direct such further relief as is appropriate under the circumstances.

Dated: 4/8/08

Respectfully Submitted,

LAW OFFICES TRACI S. MASON

By:_____

TRACI S. MASON
Attorneys for Petitioner,
WILLIE EDWARDS